Galyna Semienovna **HALAIM** and Mariya Semienovna Halaim, Petitioners,

v.

**IMMIGRATION** and **NATURALIZATION SERVICE**, Respondent.

Nos. 02–72311, 02–72312.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 5, 2003.

Filed Feb. 18, 2004.

Rocco N. Treppiedi, Spokane, WA, for the petitioners.

Robert M. Loeb, Civil Division, United States Department of Justice, Washington, DC, for the respondent.

Before: BRUNETTI, T.G. NELSON, and GRABER, Circuit Judges.

GRABER, Circuit Judge:

In this consolidated action, Petitioners Galyna Halaim and Mariya Halaim petition for review of the Board of Immigration Appeals' ("BIA") orders affirming without opinion the decision of an immigration judge ("IJ"). The IJ held that Petitioners had failed to establish their eligibility for asylum and withholding of deportation but granted Petitioners voluntary departure. Petitioners argue that (1) the IJ's determination that they did not suffer past persecution is not supported by substantial evidence in the record; (2) the Lautenberg Amendment, 8 U.S.C. § 1157 note, either applies in their favor or, if not, violates their right to equal protection; and (3) the IJ violated their due process rights.

Because Petitioners were placed in deportation proceedings before April 1, 1997, and the orders denying them asylum and withholding became final after October 30, 1996, this case is governed by the transitional rules of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–288, 110 Stat. 3009. Therefore, we have jurisdiction to consider the petitions for review under 8 U.S.C. § 1105a as amended by IIRIRA § 309(c)(4). *Chand v. INS,* 222 F.3d 1066, 1073 (9th Cir.2000). Because substantial evidence supported the IJ's determination, and because there was no constitutional violation, we must deny the petitions.

## FACTS AND PROCEDURAL HISTORY

Petitioners are sisters who are in their 70s. They are natives and citizens of Ukraine and are Pentecostal Christians. Petitioners arrived in the United States in May 1995 as nonimmigrant visitors, but they have overstayed their visas and continue to live with their brother-in-law in his mobile home in Sumas, Washington. They were placed in deportation proceedings in January 1997.

Petitioners filed applications for asylum and withholding of deportation, claiming that they had suffered past persecution in Ukraine because of their religion. Following a hearing, the IJ found Petitioners' testimony to be credible.

Mariya Halaim testified that she had suffered no problems after about 1986, when she retired. Before then, unknown persons had broken a window in her house and had stolen five chickens. Before 1960, Mariya was summoned to the police station at least four times. Sometime after 1960, she was questioned once by the police, who threatened to crucify her to a wall "like Jesus Christ." Mariya testified that she was able to attend church without difficulty from the date of her retirement around 1986, at the age of 55, until she left for the United States in 1995. While she was traveling to church meetings, however, private citizens on the streetcar or bus sometimes would scream at her and complain that Pentecostals should be exiled.

Galyna Halaim also retired around 1986. Thereafter she received a pension from the Ukrainian government, and she owned her

own home. She testified that when she was young, the police disrupted church services two to three times per month, yelling at the members of the church and telling them to go home. Later, members of volunteer militias interrupted church meetings and called parishioners "cult members." Additionally, her home was burglarized in the early 1990s, and the police refused to respond. Private citizens called her names on account of her religion. Galyna testified that she believed that the government had her name on a list, but offered no evidence that she is actually on such a list or that such a list exists.

Both sisters were denied education on account of their religion, and they testified that they therefore suffered reduced employment opportunities and were forced to do an unfair share of the work at the jobs they did hold. They testified to "constant" harassment by private citizens, which worsened after the Soviet Union split up, as a result of a misconception that Christians are "rich."

The IJ held that Petitioners failed to establish that they had suffered past persecution or, in the alternative, that they had a well-founded fear of future persecution. Consequently, the IJ denied Petitioners' claims for asylum and withholding of deportation. The IJ explained that, in her view, "[Petitioners] were never persecuted for their beliefs, but they were discriminated against." The IJ also found that Petitioners did not intend to come to the United States to ask for asylum, but chose to do so only after they arrived here and saw "how nice people were." The IJ observed that Petitioners "were able to work in the Ukraine, practice their religion and collect [a] pension."

The BIA affirmed without opinion, pursuant to 8 C.F.R. § 3.1(a)(7) (2002). Petitioners timely sought review in this court.

## STANDARDS OF REVIEW

■ We review for substantial evidence the agency's factual findings. *Monjaraz–Munoz v. INS*, 327 F.3d 892, 895 (9th Cir.), *amended by* 339 F.3d 1012 (9th Cir. 2003). We must uphold those findings unless the evidence compels a contrary result. *Id.*

■ Because the BIA affirmed without opinion, the IJ's order constitutes the final agency determination that we review. 8 C.F.R. § 3.1(a)(7) (2002). We accept Petitioners' testimony as true when, as here, the IJ found them to be credible. *Salazar–Paucar v. INS*, 281 F.3d 1069, 1073 (9th Cir.), *amended by* 290 F.3d 964 (9th Cir.2002).

■ We review de novo an agency's interpretation or application of a statute. *Brower v. Evans*, 257 F.3d 1058, 1065 (9th Cir.2001).

## DISCUSSION

I. *The IJ's determination that Petitioners failed to establish eligibility for asylum or withholding of deportation is supported by substantial evidence in the record.*

A. *Asylum*

In *Singh v. INS*, 340 F.3d 802, 807 (9th Cir.2003), we summarized what an alien must show in order to be eligible for asylum:

Section 208(a) of the Immigration and Nationality Act ("INA") gives the Attorney General discretion to grant political asylum to any alien deemed to be a "refugee" within the meaning of § 101(a)(42)(A) of the INA, 8 U.S.C. § 1101(a)(42)(A). *See* 8 U.S.C. § 1158(b)(1). "A refugee is defined as an alien unwilling to return to his or her country of origin 'because of persecution or a well-founded fear of persecution on

account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Fisher v. INS*, 79 F.3d 955, 960 (9th Cir.1996) (en banc) (quoting 8 U.S.C. § 1101(a)(42)(A)). Thus, to be eligible for asylum, an applicant must establish "either past persecution or a well-founded fear of present persecution on account of [a protected ground]." *Mejia–Paiz v. INS*, 111 F.3d 720, 723 (9th Cir.1997).

We have defined "persecution," in turn, as "the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive." *Kataria v. INS*, 232 F.3d 1107, 1112–13 (9th Cir.2000) (internal quotation marks omitted). Persecution is an "extreme concept that does not include every sort of treatment our society regards as offensive." *Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir.1995) (internal quotation marks omitted). Thus, "[d]iscrimination on the basis of race or religion, as morally reprehensible as it may be, does not ordinarily amount to 'persecution' within the meaning of the [INA]." *Id.*

■ Petitioners argue that the IJ erred in holding that the hardship inflicted on them in Ukraine on the basis of their religion was discrimination that did not rise to the level of persecution. They suggest that the IJ's recitation of the factual record was wrong in several respects and that the abuse they suffered was worse than the IJ realized. They submit that the record, properly understood, compels a finding that they suffered past persecution. We disagree.

Although the IJ's recitation of the facts in the record is not perfect, her holding that Petitioners did not suffer past persecution (as distinct from discrimination) is supported by substantial evidence in the record. Petitioners were able to secure long-term employment, and they lived relatively unmolested lives for the last decade of their time in Ukraine. Petitioners were the victims of many derogatory comments and, over the course of 50 years, a few incidents that might be deemed police harassment. Reasonable minds may differ over the question whether the abuse suffered by Petitioners constituted persecution. However, the record does not compel us to reach a conclusion different from the IJ's.

**B.** *Withholding of Deportation*

Because the adverse asylum determination is supported by substantial evidence, Petitioners are not entitled to withholding of deportation. Section 243(h) of the INA, 8 U.S.C. § 1253(h)(1) (1994), requires the Attorney General, subject to certain exceptions, to withhold deportation if the Attorney General determines that an alien's life or freedom would be threatened on account of a protected ground. An alien is statutorily eligible for such relief only if she demonstrates a "clear probability of persecution," which means it is "more likely than not" that she will be persecuted if deported. *Pedro–Mateo v. INS*, 224 F.3d 1147, 1150 (9th Cir.2000) (internal quotation marks omitted).

■ The standard of proof required to establish eligibility for withholding is higher than the standard for establishing eligibility for asylum. As a result, "failure to satisfy the lower standard of proof required to establish eligibility for asylum therefore necessarily results in a failure to demonstrate eligibility for withholding of deportation." *Id.*

**II.** *The Lautenberg Amendment does not apply to Petitioners' claims.*

■ Section 207 of the INA, codified at 8 U.S.C. § 1157 note, provides for the processing outside the United States of aliens who are applying for refugee status. The "Lautenberg Amendment" is an

amendment to section 207 that lowers the burden of proof for some categories of aliens. The covered aliens include:

> (b)(1)(A) one or more categories of aliens who are or were nationals and residents of an independent state of the former Soviet Union or of Estonia, Latvia, or Lithuania and who share common characteristics that identify them as targets of persecution in that state on account of race, religion, nationality, membership in a particular social group, or political opinion[.]

Pub.L. No. 101–167, Title V, § 599D, 103 Stat. 1261 (1989) (codified at 8 U.S.C. § 1157 note (as amended) (Establishing Categories of Aliens for Purposes of Refugee Determinations)). Evangelical Christians (such as Pentecostals) from the former Soviet Union are explicitly included in the covered categories:

> (b)(2)(A) Aliens who are (or were) nationals and residents of an independent state of the former Soviet Union or of Estonia, Latvia, or Lithuania and who are Jews or Evangelical Christians shall be deemed a category of alien established under paragraph (1)(A).

*Id.* The Amendment provides that a covered alien "may establish, *for purposes of admission as a refugee under section 207 of the [INA]* [this section], that the alien has a well-founded fear of persecution on account of . . . religion . . . by asserting such a fear and asserting a credible basis for concern about the possibility of such persecution." *Id.* (emphasis added).

Because they are physically present in the United States, however, Petitioners are applying for asylum and withholding of deportation only under section 208 of the INA, 8 U.S.C. § 1158. The plain meaning of the Lautenberg Amendment, as evinced by its unambiguous text, limits its application to section 207 proceedings only. The Amendment therefore cannot be invoked directly by Petitioners.

Petitioners argue, however, that the Amendment applies indirectly, because 8 C.F.R. § 208.13(b)(2) "can and should be interpreted" to bestow on section 208 applicants the same lower evidentiary standard afforded under the Lautenberg Amendment to section 207 applicants. Title 8 C.F.R. § 208.13(b)(2)(i) states that an applicant has a well-founded fear of persecution if:

> (A) The applicant has a fear of persecution in his or her country of nationality or, if stateless, in his or her country of last habitual residence, on account of race, religion, nationality, membership in a particular social group, or political opinion;

> (B) There is a reasonable possibility of suffering such persecution if he or she were to return to that country; and

> (C) He or she is unable or unwilling to return to, or avail himself or herself of the protection of, that country because of such fear.

The regulation goes on to state:

> In evaluating whether the applicant has sustained the burden of proving that he or she has a well-founded fear of persecution, the asylum officer or immigration judge shall not require the applicant to provide evidence that there is a reasonable possibility he or she would be *singled out individually for persecution* if:

> (A) The applicant establishes that there is a pattern or practice in his or her country of nationality or, if stateless, in his or her country of last habitual residence, of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and

> (B) The applicant establishes his or her own inclusion in, and identification with, such group of persons such that his

or her fear of persecution upon return is reasonable.

8 C.F.R. § 208.13(b)(2)(iii) (emphasis added).

Petitioners note the regulation's explanation that an applicant need not establish that she would be "singled out individually for persecution" if she can establish that she is included in and identified with a group of similarly situated persons who have experienced a pattern or practice of persecution such that her fear of persecution is reasonable. Petitioners reason from this provision, and from the lower evidentiary standard required for section 207 refugee status among Ukrainian Pentecostals, that *all* Ukrainian Pentecostals have a credible basis for establishing persecution.

In essence, Petitioners assert that the Lautenberg Amendment (as elaborated in the regulations) represents a congressional declaration that Ukrainian Pentecostals suffer in their native land from a pattern or practice of persecution based on religion. Because they are Ukrainian Pentecostals, Petitioners argue, they must qualify for 8 C.F.R. § 208.13(b)(2)'s lower burden of proving a well-founded fear of persecution.

This argument is creative but not persuasive. The Lautenberg Amendment does not act as an across-the-board declaration by Congress that each Ukrainian Pentecostal has been persecuted. To the contrary, in three ways the Amendment makes clear that this is not so. First, the Amendment expressly limits its application to section 207 claims and therefore is not across-the-board for all Ukrainian Pentecostals. Second, the Amendment still requires each applicant to "establish" a particularized well-founded fear, even if the applicant's evidence pertains to co-religionists generally. 8 U.S.C. § 1157 note at (a). Third, a lower standard of proof is not the same as a conclusive presumption.

Petitioners offer arguments based on the legislative history of the Amendment. Because the meaning of the Lautenberg Amendment is clear from its text, however, reference to legislative history is inappropriate. *See United States v. Gonzalez–Mendez,* 150 F.3d 1058, 1061 (9th Cir.1998) ("[W]e do not consider legislative history when a statute is clear on its face.").[1]

Ukrainian evangelical Christians whose asylum applications are processed outside the United States may avail themselves of the Lautenberg Amendment. Ukrainian evangelical Christians whose applications are processed inside the United States may avail themselves of the asylum regulation, but that regulation places some conditions on its invocation. Under 8 C.F.R. § 208.13(b)(2)(i), a Ukrainian Pentecostal (or anyone else) seeking recourse to the lower evidentiary standard (which is, in fact, identical to the lower burden established in the Lautenberg Amendment) must establish that there is a practice in Ukraine to persecute her group based on a protected category. As we have explained, mere reference to the Lautenberg Amendment does not satisfy this requirement. Some other evidence must be adduced. And, as we have explained above, the evidence in this record does not compel a

---

1. Even were recourse to legislative history appropriate, it would not help Petitioners. The original version of what would become the Lautenberg Amendment would have created a "presumption that Jews and Evangelical Christians in the Soviet Union are, as a group, subject to persecution." H.R.Rep. No. 101–122, at 7 (1989). This "presumption" was dropped in the enacted version. 135 Cong. Rec. S8335, S8379 (1989). If anything, then, the legislative history supports a view that Congress considered but rejected a version of the Amendment that created a presumption of group persecution of Ukrainian Pentecostals.

finding of governmental persecution of Petitioners.

## III. *The Lautenberg Amendment does not violate equal protection.*

■ Petitioners argue that if the Lautenberg Amendment applies only to section 207 claims, it violates their constitutionally guaranteed right to equal protection because similarly situated people—Ukrainian Pentecostals processed outside the United States and those processed within the United States—are treated differently without a showing of a substantial governmental interest. We are not persuaded.

It is well established that aliens in the United States are protected by the Due Process Clause of the Constitution, which incorporates the guarantees of equal protection. *Garberding v. INS,* 30 F.3d 1187, 1190 (9th Cir.1994). However, because federal authority in the areas of immigration and naturalization is plenary, " '[f]ederal classifications distinguishing among groups of aliens ... are valid unless "wholly irrational." ' " *Id.* (quoting *Sudomir v. McMahon,* 767 F.2d 1456, 1464 (9th Cir. 1985)).

In introducing his eponymous Amendment, Senator Lautenberg expressed on the floor of the Senate a rational basis for distinguishing between applicants overseas and those already in the United States: The INS was struggling in its overseas evaluations of the petitions brought by members of the groups covered by the Amendment. Senator Lautenberg explained:

> GAO [the General Accounting Office] visited Rome and Moscow to review the process by which INS officers were interviewing potential Soviet refugees. GAO found that the results of the interviews were inconsistent. Who was determined to be a refugee depended not on the merits of the individual applying, but on the particular officer interviewing the applicant. Specifically, GAO found that whether someone received refugee status depended on the INS officers' level of knowledge of conditions in the Soviet Union, how long the interview was, and whether the INS officer asked open[-ended] or specific questions. GAO's conclusions were reinforced by the fact that 50 percent of those whose applications were initially denied were granted refugee status after an appeal.

> Similarly, World Relief, the international humanitarian assistance arm of the National Association of Evangelicals in January sent a seven member legal task force to Rome in response to the denial of the first 170 Pentecostals ever denied refugee status. The task force found that virtually all the denials were the result of the INS's misapplication of the refugee standard as well as major inconsistencies in the adjudication process. Inconsistencies included interviews that lasted only 10 minutes, including 5 minutes of those for translation. They also resulted from varying levels of knowledge of country conditions, inadequate training of INS officers, and a tremendous volume of workload.

> . . . .

> . . . . [T]his sends the wrong foreign policy message to the Soviet Union. In essence, it says that 30,000 Soviet Jews and Evangelical Christians a year face no legitimate fear of persecution in the Soviet Union, and that conditions there are fin[e] for these groups.

> Mr. President, since conditions for the historically persecuted groups in this bill have not improved, nor has the INS shown an ability to fairly interview refugee applicants from these groups, this

bill is desperately needed as an interim measure.

135 Cong. Rec. S4612–02, S4619 (1989).

A desire to respond to a particular failure of immigration officials overseas provides a rational basis for applying different standards of proof to applicants depending on whether they are located overseas or in the United States. The Lautenberg Amendment's mechanism of lowering the burden of proof is rationally related to this legitimate congressional purpose. *See Taylor v. Rancho Santa Barbara,* 206 F.3d 932, 935 (9th Cir.2000) ("Under rational-basis review, ... a classification must be upheld if there is any reasonably conceivable set of facts that could provide a rational-basis for the classification. Courts reviewing for a rational basis must accept a legislature's generalizations even when there is an imperfect fit between means and ends; mathematical nicety is not required." (internal citation and quotation marks omitted)). The Lautenberg Amendment, therefore, does not violate the constitutional guarantee of equal protection in its differing treatment of immigration applicants from the same group based on their geographical location at the time of processing.

## IV. *The IJ did not deny Petitioners due process.*

Petitioners argue that the IJ denied them due process in two ways: (1) by indicating that she was predisposed to deny their applications before all evidence was presented; and (2) by assuming a "prosecutorial function" that intimidated and confused Petitioners and prevented them from testifying completely.

### A. *"Prejudgment"*

■ On the first claim, Petitioners point out that the IJ said, during the first merits hearing, that she would "tell you what my decision will be today. It will be unwritten, but I will tell you what the decision will be." At the end of the day, however, the IJ ordered the record held open, and a second hearing took place three months later. Petitioners submitted more than 100 pages of additional documentary evidence in the three months during which the record was open between the first and second merits hearings. Further evidence was taken at the second hearing. Petitioners argue that their due process rights were violated by the IJ's "predetermining" of their case before she had heard all the evidence.

"Due process challenges to deportation proceedings require a showing of prejudice to succeed." *Ortiz v. INS,* 179 F.3d 1148, 1153 (9th Cir.1999). Petitioners implicitly suggest that the IJ made up her mind too soon and that, had she waited, some of the evidence proffered after her moment of hasty judgment would have changed her mind. However, there is nothing in the record that supports such a view. The IJ's comment was made in response to a question from Petitioners' counsel, inquiring as to whether a decision would be given that day. Notwithstanding her reply that she would provide an oral decision at the end of the first hearing, the IJ did not in fact announce a decision but continued the case for three months and held a second hearing.

In context, the IJ was responding simply that she would render a decision the same day if time allowed. Time did not allow, she did not issue a decision, the case was continued, and at the second hearing more evidence was accepted and new testimony taken from several witnesses. Nothing in the record suggests that the IJ ignored the additional documents or the evidence from the second hearing when she eventually decided the case.

## B. *"Prosecutorial Function"*

Petitioners also argue that the IJ violated their due process rights by adopting a "prosecutorial" stance that confused and frightened the sisters and prevented them from testifying fully. Petitioners concede that 8 U.S.C. § 1229a(b)(1) grants an IJ the authority to "interrogate, examine, and cross-examine the alien and any witnesses." However, Petitioners claim that the IJ in this case crossed the line by failing to remain impartial and by attempting to establish proof to support the agency's position. *See Matter of Lam,* 14 I. & N. Dec. 168, 170, 1972 WL 27428 (B.I.A. 1972) ("Certainly a trial examiner is free to and should interrupt witnesses on occasions when necessary to a clarification of the testimony. But he must be impartial and must not attempt to establish proof to support the position of any party to the controversy; once he does so he becomes an advocate or a participant, thus ceasing to function as an impartial trier of fact, and a hearing so conducted is lacking in the fundamental fairness required by due process." (internal quotation marks omitted)).

The record does not support Petitioners' assertion. The passages quoted by Petitioners do not demonstrate that the IJ did not act impartially. For example, Petitioners cite the IJ's interruption of Galyna Halaim's testimony to explain:

> [IJ]: Okay, let me, I have been really, really giving you leeway to answer any which way you want. You need to answer the question that is being asked by the prosecutor. If the question calls for a yes or a no answer, you need to answer yes or no or you can say I don't know, but you cannot go on and explain something that is not related to the question. Your attorney can come back—
>
> [G. Halaim]: Excuse me, please.

> [IJ]: That's all right. Your attorney can come back and ask you to explain in detail. But when the prosecutor asks you a question, you need to answer only her questions.

All of Petitioners' other examples of alleged misconduct are of a similar character, and none rose to the level of intimidation or advocacy for the agency.

## CONCLUSION

The IJ's determination that Petitioners failed to establish their eligibility for asylum is supported by substantial evidence in the record. Petitioners therefore necessarily failed to establish their eligibility for withholding of removal. The Lautenberg Amendment does not apply directly or indirectly to Petitioners' cases, and its inapplicability does not violate equal protection. Finally, the IJ's conduct of the hearings did not deny Petitioners due process.

## PETITIONS DENIED.