**Dinko Ivanov MIHALEV, Petitioner,**

v.

**John ASHCROFT, Attorney General, Respondent.**

No. 02–73434.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 10, 2004.

Filed Nov. 9, 2004.

Nicolette Glazer, Law Offices of Larry R. Glazer, Century City, CA, for the petitioner.

Jennifer A. Parker, U.S. Department of Justice, Washington, DC, for the respondent.

Before: D.W. NELSON, KOZINSKI, and GRABER, Circuit Judges.

GRABER, Circuit Judge.

Petitioner Dinko Ivanov Mihalev petitions for review of the Board of Immigration Appeals' ("BIA") order affirming without opinion the decision of an immigration judge ("IJ"). The IJ rejected Petitioner's claims for asylum, withholding of deportation, and relief under the Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment ("the CAT") and ordered Petitioner removed. Petitioner argues that the IJ's determination that he did not suffer past persecution is not supported by the record.[1] We agree, grant the petition in part, and remand the matter to the BIA.

## JURISDICTION

Because Petitioner was placed in deportation proceedings after April 1, 1997, the permanent rules of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 govern this case. *Lopez–Molina v. Ashcroft*, 368 F.3d 1206, 1208 (9th Cir. 2004). Section 242(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1252(a)(1), gives us jurisdiction to consider the petition for review.

## STANDARDS OF REVIEW

We review for substantial evidence the agency's factual findings. *Monjaraz–Munoz v. INS*, 327 F.3d 892, 895 (9th Cir.), *amended by* 339 F.3d 1012 (9th Cir.2003). We must uphold those findings unless the evidence in the record compels a contrary result. *Id.*

Because the BIA affirmed without opinion, the IJ's order constitutes the final agency determination that we review. *Knezevic v. Ashcroft*, 367 F.3d 1206, 1210 (9th Cir.2004). We accept Petitioner's testimony as true when, as here, the IJ found him to be credible. *Halaim v. INS*, 358 F.3d 1128, 1131 (9th Cir.2004).

## FACTS AND PROCEDURAL HISTORY

Petitioner is a native and citizen of Bulgaria. He is of Roma, commonly known as Gypsy, descent. In May 1999, he applied for admission to the United States from Mexico without possessing valid entry documents. In August 1999, the Immigration and Naturalization Service [2] ("INS") issued a Notice to Appear, charging Petitioner under 8 U.S.C. § 1182(a)(7)(A)(i)(I) with being an immigrant who at the time of his application for admission was not in possession of a valid entry document. Petitioner admitted the allegations and con-

---

**1.** Petitioner also argues that the BIA violated his due process rights by issuing a single member "streamlined decision." That argument is foreclosed by *Falcon Carriche v. Ashcroft*, 350 F.3d 845, 848 (9th Cir.2003).

**2.** On March 1, 2003, the INS ceased to exist as an independent agency within the Department of Justice and its functions were transferred to the newly formed Department of Homeland Security.

ceded removability, but applied for asylum, withholding of removal, and relief under the CAT. Petitioner based his application on the circumstances related to three arrests and detentions he endured in Bourgas, Bulgaria.

Petitioner testified at his removal hearing, and the IJ admitted into the record the transcript of Petitioner's "credible fear" interview. During the hearing, Petitioner swore to the truth of the information included in his asylum application.[3] Following the hearing, the IJ found Petitioner to be credible. We therefore recount the events as Petitioner described them.

The first arrest occurred on December 28, 1998. Petitioner was hosting a birthday party in his apartment and playing music at a volume that was not loud. His guests were also Roma. At about 12:30 a.m., three police officers forcibly entered the apartment and announced that they were responding to a noise complaint from some neighbors. The police then began beating the people in the apartment, while calling them names and saying that Gypsies did not deserve to live. The officers also accused those in attendance of taking drugs; they conducted a search that turned up nothing.

The police took Petitioner to the police station and jailed him for 10 days, telling him that he had been arrested for instigating Gypsy gatherings. Petitioner was beaten every day of his detention with bags of sand. The police avoided hitting Petitioner in the face, and he suffered no significant injury. Petitioner was also taken to a construction site and forced to do heavy work. The police told Petitioner that they would not release him unless he

signed a document avowing that he had not been harmed while in custody; Petitioner signed the paper and was released. Petitioner was never charged with a crime arising out of this incident.

Petitioner's second arrest occurred on February 11, 1999. Petitioner was walking home at about midnight when a police car pulled up next to him, and an officer demanded Petitioner's identification documents. Petitioner did not have the documents with him. The police handcuffed him and took him to the station. After checking their records and learning that Petitioner had been arrested previously, the police accused Petitioner of committing a robbery in the neighborhood in which he had been picked up. The police detained Petitioner for two weeks, again beating him with bags of sand and forcing him to work on a construction site. Petitioner again was not charged with any crime. After Petitioner signed another form stating that he had not been harmed, the police released him but advised him that he had to report to the police station at frequent intervals.

Petitioner's third arrest occurred on April 4, 1999, when Petitioner arrived for his periodic check-in at the police station. When he inquired as to why he was being arrested, the police began beating Petitioner and told him that they would be the ones asking the questions. Petitioner was again forced to engage in construction work. One of the officers guarding the construction site sexually assaulted Petitioner. Petitioner escaped on the fifth day of his detention and fled to Hungary, making his way later to Mexico and eventually to the United States.

---

**3.** The application is thus part of the record that must be considered. "The IJ must consider evidence contained in [an] application for asylum. Testimony is not required; an applicant may rest on her application, if she swears at the hearing that the contents of the application are true." *Ochave v. INS*, 254 F.3d 859, 865 (9th Cir.2001).

The IJ issued an oral decision. He held that Petitioner had failed to establish that he had suffered past persecution on account of his Gypsy ethnicity. The IJ noted that the State Department Country Report for Bulgaria states that "criminal suspects in police custody run a significant risk of being mistreated." The Report did not limit its observation to particular ethnic groups, but instead suggested that *all* jailed suspects were at risk of being abused. The IJ stated that he did not find "that [Petitioner's] problems recited above have been shown to be 'on account of' [Petitioner's] ethnicity." The IJ also held that, in view of the fact that Petitioner was not injured and did not ever require any medical attention as a result of the mistreatment, Petitioner had not suffered past persecution. The IJ therefore denied Petitioner's application for asylum.

In the oral decision, the IJ did not separately analyze or discuss Petitioner's claim for relief under the CAT. The IJ's written order checked a box next to a blank space that the IJ filled in to read "Convention Against Torture Denied." The written order also stated, however, that it was provided solely for the convenience of the parties and that, on appeal, the oral decision is the official opinion in the case.

The BIA affirmed without opinion, pursuant to 8 C.F.R. § 3.1(a)(7) (2002).[4] Petitioner timely sought review in this court.

## DISCUSSION

I. *The IJ's holding that Petitioner failed to establish eligibility for asylum is not supported by substantial evidence in the record.*

We have recently explained what an alien must prove in order to establish eligibility for asylum:

Section 208(a) of the Immigration and Nationality Act ("INA") gives the Attorney General discretion to grant political asylum to any alien deemed to be a "refugee" within the meaning of § 101(a)(42)(A) of the INA, 8 U.S.C. § 1101(a)(42)(A). 8 U.S.C. § 1158(b)(1). "A refugee is defined as an alien unwilling to return to his or her country of origin 'because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.' " *Fisher v. INS*, 79 F.3d 955, 960 (9th Cir.1996) (en banc) (quoting 8 U.S.C. § 1101(a)(42)(A)). Thus, to be eligible for asylum, an applicant must establish "either past persecution or a well-founded fear of present persecution on account of [a protected ground]." *Mejia–Paiz v. INS*, 111 F.3d 720, 723 (9th Cir.1997) (internal quotation marks omitted).

*Singh v. Ashcroft*, 362 F.3d 1164, 1170 (9th Cir.2004).

The IJ held that Petitioner had failed to establish his eligibility for asylum for two independently sufficient reasons: (1) he had not shown that any persecution he suffered was "on account of" his Gypsy ethnicity, and (2) the abuses he suffered at the hands of Bulgarian police did not amount to past persecution.

There is no question that Gypsies are an identifiable ethnic group and that being a Gypsy is a protected ground under § 208 of the INA. There also is no question that Bulgarian Gypsies as a group suffer from widespread discrimination. The 1999 State Department Country Report for Bulgaria reported that, "[a]s individuals and as an ethnic group, Roma faced high levels of discrimination." The issues before us are whether Petitioner established a nexus

---

4. This section was redesignated as 8 C.F.R. § 1003.1 on February 28, 2003.

between his ethnicity and his mistreatment and whether the mistreatment rose to the level of persecution.

### A. "On Account of"

The IJ observed that, according to the State Department Country Report, *all* suspects in the custody of Bulgarian police forces run a significant risk of being abused. From that premise, the IJ reasoned that the record contained "no evidence ... that the police took the actions that they did simply because [Petitioner] is a gypsy."

■ If the IJ meant that there is no evidence that the police mistreated Petitioner *solely* because of his ethnicity, his statement mischaracterizes the law. In order to establish that persecution was "on account of" one of the five protected grounds, an asylum applicant need not prove that such a ground was the *only* reason for the persecution. As we explained in *Navas v. INS*, 217 F.3d 646, 656 (9th Cir.2000), "this court has made clear [that] the statute covers persecution on account of [a protected ground] even where the persecutor acts out of mixed motives. Put another way, the protected ground need only constitute *a* motive for the persecution in question; it need not be the *sole* motive."

It is also clear from the IJ's decision, however, that he found that Petitioner's ethnicity played *no* role in the police mistreatment, a finding that we must review for substantial evidence. We conclude that the IJ's finding is supported with respect to the second and third arrests, but that the record compels the conclusion that the first arrest was "on account of" Petitioner's ethnicity.

#### (1) *The First Arrest*

■ When the police entered Petitioner's apartment on the night of the first arrest, they announced that they were responding to a noise complaint. Later they announced that they were conducting a drug search. If those were the actual reasons for Petitioner's arrest, of course, the IJ's finding would be supported by substantial evidence.

However, during these events, the police officers told the partygoers expressly that Gypsies did not deserve to live, and they beat the people present in the apartment.[5] When Petitioner was taken into custody, the police told him that he was being arrested as the "instigator" and that he was being held because he was "initializing gypsy gatherings."

The police officers' contemporaneous declarations that Gypsies did not deserve to live and that Petitioner was being held because he had been organizing Gypsy gatherings are facts that compel any reasonable factfinder to find that the police were motivated—at least in part—by Petitioner's ethnicity when they made the first arrest and detained Petitioner thereafter.

The dissent concludes that only the arrest, but not the beatings that followed, arose from Petitioner's Gypsy ethnicity. Dissent at 731, 733–34. The record cannot support that distinction. It is true that the beatings began immediately upon Petitioner's arrest: "Three policemen forcibly entered the apartment, and they started beating us, calling us names (gypsies didn't

---

**5.** Petitioner testified that, although a person in Bulgaria could not identify him as a Gypsy merely by looking at him, they could tell if they got to know him a little or if they learned of the circle of people in which he traveled. Petitioner stated during his "credible fear" interview and in his testimony that, during the time Bulgaria was under communist rule, there were lists of Gypsies. Petitioner also stated during his interview that Gypsies are identifiable based on their culture, music, and neighborhood.

deserve to live)." But then these same three police officers "took me to the police station and they said that I was the instigator." The instigator of what? "They just told me that I was initializing gypsy gatherings." Petitioner gave that answer in response to a question about his detention and the charges underlying it. The only fair reading of Petitioner's testimony as a whole is that the three arresting officers, when they brought Petitioner to the station, informed the officers on duty at the station of Petitioner's Gypsy ethnicity and the allegation that he had been caught "initializing gypsy gatherings." There was but a single, ongoing course of conduct.

### (2) *The Second Arrest*

■ Petitioner's second arrest occurred when he was stopped on the street, apparently near the scene of a robbery, and did not have his identification papers with him. Petitioner testified that he is not identifiable as a Gypsy merely by his appearance, so a factfinder is not compelled to find that the initial stop was motived by his ethnicity. Furthermore, Petitioner presented no evidence to suggest that his police records identify him as a Gypsy, nor that any of the police officers involved in his first arrest (who knew that he was a Gypsy) were involved in the second. Petitioner testified that Bourgas is a city of a quarter-million people, so there is no necessary inference that the precinct and personnel were the same. In short, nothing in the record establishes that any of the officers involved in Petitioner's second arrest was even aware of the fact that he was a Gypsy. Therefore, the IJ's determination that the second arrest was not "on account of" Petitioner's ethnicity is supported by substantial evidence in the record.

### (3) *The Third Arrest*

■ Petitioner's third arrest arose out of his required periodic check-in at the local police station. As with the second arrest, the record does not compel the conclusion that any of the officers involved in the third arrest knew that Petitioner was a Gypsy. Therefore, the IJ's finding that this arrest was not on account of Petitioner's ethnicity is supported by substantial evidence.

### (4) *Summary*

In summary, we hold that the IJ's finding that Petitioner's mistreatment was not "on account of" his Gypsy ethnicity is not supported by substantial evidence with respect to the first arrest and detention. As to the first arrest and detention, the record compels a finding that the Bulgarian police had at least mixed motives for their actions, which included Petitioner's ethnicity.

By contrast, we hold that the IJ's finding that Petitioner's mistreatment was not "on account of" Petitioner's ethnicity is supported by substantial evidence as it relates to the second and third arrests. Therefore, if Petitioner is to establish past persecution, it must be on the basis of the circumstances surrounding his first arrest and detention alone.

### B. *Past Persecution*

Our inquiry on the question of what kind of mistreatment qualifies as persecution is fact-intensive. As a result, our decisions often seem to point in opposite directions on relatively similar facts. Nevertheless, there are several fundamental legal principles that we have always accepted as key guide-posts in discerning whether particular conduct is so egregious as to constitute persecution.

■ We have consistently held that persecution is "an extreme concept that does not include every sort of treatment that

our society regards as offensive." *Gormley v. Ashcroft*, 364 F.3d 1172, 1176 (9th Cir.2004) (internal quotation marks and brackets omitted). The operative question is "whether, looking at the cumulative effect of all the incidents that a Petitioner has suffered, the treatment he received rises to the level of persecution." *Id.* at 1176–77 (internal quotation marks and brackets omitted).

We have also "consistently found persecution where ... the petitioner was physically harmed because of his race, religion, nationality, membership in a particular social group, or political opinion." *Duarte de Guinac v. INS*, 179 F.3d 1156, 1161 (9th Cir.1999). That standard does not make things as easy as it may seem, however, for we have held that some circumstances that cause petitioners physical discomfort or loss of liberty do not qualify as persecution, despite the fact that such conditions have caused the petitioners some harm. For example, in *Prasad v. INS*, 47 F.3d 336, 339 (9th Cir.1995), a single four-to-six-hour detention, in which Petitioner was hit on his stomach and kicked from behind, was insufficient to compel a finding of past persecution. A four-day detention was not persecution when the petitioner was "not tortured, beaten, molested, harmed, or even threatened." *Mendez–Efrain v. INS*, 813 F.2d 279, 283 (9th Cir.1987).

█ In this case, Petitioner was jailed for 10 days, beaten every day with bags of sand, and refused release until he signed a statement attesting that he was not harmed while in custody. However, there is no evidence that Petitioner suffered a significant injury as a result of those beatings.

Having searched our case law for guidance, we believe that the Ninth Circuit case with the most helpfully similar set of facts to those presented here is *Guo v. Ashcroft*, 361 F.3d 1194 (9th Cir.2004). In *Guo* we held that the petitioner, a Chinese Christian, had suffered persecution on two separate occasions, either of which we held would have been independently sufficient to compel a finding of past persecution. The first incident occurred when Chinese police raided a home in which the petitioner was taking part in prayer services. *Id.* at 1197. The police detained the petitioner for a day and a half, and he was asked to admit that he had participated in an illegal religious gathering. When he refused to renounce his belief in the " 'evil religion,' " a police officer struck the petitioner twice in the face and ordered him to do pushups until he could no longer perform them. *Id.* While the petitioner remained exhausted on the floor, the police kicked him in the stomach. The police told the petitioner that he would be persecuted unless he signed an affidavit promising not " 'to believe in such a[n] evil religion again,' " and the petitioner signed the affidavit to avoid further abuse. *Id.* We held that the "totality of the circumstances compels a finding that [the petitioner] was persecuted during his first detention because of his religious beliefs." *Id.* at 1203.

In the second incident in *Guo*, the same petitioner tried to stop a Chinese police officer from removing a cross on a tomb. *Id.* at 1197–98. The police officer used an electrically charged baton to subdue the petitioner, and two officers held his arms and kicked his legs, causing him to fall. *Id.* at 1198. The police took the petitioner to the police station, where the officer who had attempted to remove the cross hit the petitioner in the face seven or eight times. The petitioner was also tied to a chair and beaten with a plastic pole. Our opinion makes no reference to injuries resulting from this beating. The petitioner was detained for 15 days before being released. *Id.* We held that "[t]his treatment rises to

the level of persecution on account of [the petitioner's] religion." *Id.* at 1203.

The facts surrounding Petitioner's first arrest and detention are closer to those in *Guo* than to those in *Prasad* or *Mendez–Efrain.* Petitioner was detained for 10 days, which is considerably longer than the detentions in *Prasad* and *Mendez–Efrain.* In addition, unlike the petitioners in *Prasad* or even *Guo,* Petitioner was not just subjected to a single instance of physical abuse, but was repeatedly beaten every day of his detention.

The fact that Petitioner suffered no serious bodily injury and required no medical attention makes the question closer. But it would be a strange rule if the absence or presence of a broken arm were the dispositive fact. There is no suggestion in *Guo* that the petitioner was significantly injured as a result of being hit in the face seven or eight times and beaten with a plastic pole. Yet we found that this single beating, accompanied by a 15–day detention, was so extreme as to compel a finding of past persecution. In this case, we have a 10–day detention, accompanied by daily beatings and hard labor. Following *Guo,* we believe that the abuse Petitioner suffered was so extreme as to compel a finding of past persecution.

The dissent argues that, because every suspect in Bulgarian police custody runs "a significant risk of being abused," for Petitioner to establish persecution "on account of" ethnicity, he must demonstrate that Gypsies in Bulgarian jails are treated worse than other detainees or that he himself was treated worse than other detainees. Dissent at 732. A "significant risk," however, is not a certainty that erases any possible connection between abuse and a protected ground. *Cf. Zepeda–Melendez v. INS,* 741 F.2d 285, 290 (9th Cir.1984) (holding that widespread violence affecting "all" persons in the country was not specif-ic enough for political asylum). Moreover, there is no requirement of having been abused more than someone else. An asylum seeker has to establish only that the abuse rose to the level of persecution and that it was inflicted on account of a protected ground. *See* 8 U.S.C. § 1101(a)(42)(A) (defining "refugee"). Asylum seekers who have fled from generally repressive regimes have no higher a burden than those who have fled from generally benign countries. For the reasons we have explained, Petitioner has met his burden here.

■ We therefore hold that the record compels a finding that Petitioner suffered past persecution on account of his Gypsy ethnicity, and we grant the petition on that ground. A finding of past persecution gives rise to a presumption of eligibility for asylum. *Hoque v. Ashcroft,* 367 F.3d 1190, 1198 (9th Cir.2004). Following remand, the Attorney General may rebut that presumption by showing that there has been a fundamental change in circumstances such that Petitioner no longer has a well-founded fear of future persecution. If the presumption is not rebutted, the Attorney General will decide whether to exercise his discretion and grant Petitioner asylum. *Id.*

## II. *Withholding of Removal*

■ A petitioner may obtain the relief of withholding of removal if the petitioner can establish that his or her "life or freedom would be threatened" in the country to which he or she would be removed on account of one of the five protected grounds. 8 U.S.C. § 1231(b)(3)(A). "An alien is statutorily eligible for such relief only if [he or] she demonstrates a 'clear probability of persecution,' which means it is 'more likely than not' that [he or] she will be persecuted if deported." *Halaim,*

358 F.3d at 1132 (quoting *Pedro–Mateo v. INS*, 224 F.3d 1147, 1150 (9th Cir.2000)).

The standard of proof required to establish eligibility for withholding of removal is higher than the standard for establishing eligibility for asylum. *Id.* The IJ's holding that Petitioner had not established eligibility for asylum thus obviated the need for the IJ to consider separately the withholding-of-removal claim.

 However, a finding of past persecution gives rise to a presumption of withholding of removal. *Hoque*, 367 F.3d at 1198. Because we have now held that Petitioner established past persecution, on remand the BIA must reconsider Petitioner's withholding-of-removal claim.

### III. *Convention Against Torture*

 An applicant may obtain relief under the CAT if the applicant establishes "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). The IJ did not discuss or even mention Petitioner's CAT claim in his oral decision. The IJ did write "Convention Against Torture Denied" in the written order. However, that document also stated that it was prepared solely for the convenience of the parties and that, on appeal, only the oral decision is official. Looking to the oral decision alone, it appears that the IJ did not address Petitioner's CAT claim at all. If that is the case, then we must remand so that the agency may consider the claim in the first instance. *INS v. Ventura*, 537 U.S. 12, 16, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) (per curiam).

It also is possible to read the IJ's oral decision as relying sub silentio on his asylum analysis for the purposes of the CAT claim. If that was the IJ's intention, his analysis was erroneous. The standards for obtaining relief under the CAT and the standards for obtaining asylum are very different. *See Kamalthas v. INS*, 251 F.3d 1279, 1283 (9th Cir.2001) (noting that CAT claims are "analytically separate" from claims for asylum). Therefore, we still would have to remand Petitioner's CAT claim so that the agency may address this claim under the correct legal standard.

### CONCLUSION

The IJ's determination that Petitioner failed to establish his eligibility for asylum is not supported by substantial evidence in the record. The record compels a finding that Petitioner suffered persecution in Bulgaria. We therefore remand for consideration of Petitioner's asylum and withholding-of-removal claims. We also remand so that the agency may consider Petitioner's CAT claim using the correct legal standard.

PETITION GRANTED in part; REMANDED.

KOZINSKI, Circuit Judge, dissenting:

Petitioner testified that he was arrested for hosting a party with his gypsy friends and that the police made disparaging remarks about gypsies when they arrested him. These facts support the majority's conclusion that the arrest was on account of his gypsy ethnicity. But the beatings the majority believes amount to persecution happened *after* the arrest, and petitioner offered no evidence to connect that abuse to his ethnicity.

We have sometimes found derogatory comments sufficient to establish the motive for persecution, but only where they were made "[i]n the course of persecuting" the alien. *Baballah v. Ashcroft*, 367 F.3d 1067, 1077 (9th Cir.2004); *see also, e.g., Maini v. INS*, 212 F.3d 1167, 1176 (9th Cir.2000) ("[T]he 'repeated beatings coupled with explicit expressions of [religious] hatred' ...

compel a finding of persecution on account of religion." (quoting *Duarte de Guinac v. INS*, 179 F.3d 1156, 1162 (9th Cir.1999)) (omission and first alteration added)). When someone is called names while being beaten, it's reasonable to associate the two. Here, petitioner was abused in custody—after the arrest and, for all we know, by different officers. Petitioner has presented nothing to compel a finding that the earlier derogatory remarks were connected to the subsequent abuse.

The majority attempts to tie the improper arrest to the beating by suggesting that the abusers knew petitioner's ethnicity, having been informed of that fact by the officers who arrested him. Maj. op. at 728. But this is hardly an inference that's compelled by the record. Here's the relevant excerpt from petitioner's hearing before the IJ:

Q. Okay. And then what happened [after the police came into your apartment]?

A. After that I was arrested because they blamed me, that I initiated the whole thing.

Q. Okay. And how long were you held in detention?

A. I was held for 10 days.

Q. Were charges filed against you?

A. They didn't state any concrete charges. They just told me that I was initializing gypsy gatherings.

A.R. 84. And, in his credible fear interview, petitioner explained:

[The police] searched the apartment and found nothing. They took me to the police station and they said that I was the instigator. They held me for ten days.

A.R. 203. There is no other evidence on this point.

Petitioner never testified that the officers who beat him while he was in prison were the same ones who arrested him. Nor did he say that the statement about initializing gypsy gatherings was made at the police station or otherwise in the presence of the officers who later beat him. And he admitted that he doesn't look like a gypsy. *See* A.R. 102 (noting that people couldn't tell petitioner was a gypsy just by looking at him).

The most we can say about the record is that it would support an inference that the officers who beat petitioner knew of his gypsy ethnicity—had the IJ made such a finding. But how can we possibly say that's the *only* finding the record will support? Our job isn't to nitpick the IJ's findings, looking for ways we can construe the record to undermine them. Rather, we must uphold the IJ's findings unless the record *compels* a contrary result. *See Ochave v. INS*, 254 F.3d 859, 862 (9th Cir.2001) ("When reviewing for substantial evidence, we must uphold the IJ's findings unless the evidence not only supports, but compels, contrary findings." (citing *INS v. Elias–Zacarias*, 502 U.S. 478, 481 n. 1, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992))). Given the ambiguities in petitioner's testimony, a reasonable fact-finder could have found that the arresting officers never informed their colleagues at the police station that petitioner is a gypsy, and that the officers who did the beating had no other basis for knowing petitioner's ethnicity.

Yet, even if the majority's interpretation of the record were the only reasonable one, showing that the officers at the station were aware of petitioner's gypsy ethnicity hardly proves they abused him *because of* it. If beatings in Bulgarian prisons were rare, we might infer such a connection. But we can't take this leap here because the IJ specifically found that *any* suspect held in custody by the Bulgarian police has a significant risk of being abused. *See* E.R. 59 ("Reports

continue that criminal suspects in police custody run a significant risk of being mistreated.") (quoting Bureau of Democracy, Human Rights, & Labor, U.S. Dep't of State, *Bulgaria Country Report on Human Rights Practices for 1998* (1999) [hereinafter *1998 Human Rights Report*], *reprinted in* E.R. 252, 254). The State Department mentions, for instance, that "[s]ecurity forces beat suspects and inmates and at times arbitrarily arrested and detained persons." *1998 Human Rights Report* at E.R. 252. In addition, "[c]redible sources reported cases of brutality committed by prison guards against inmates." *Id.* at E.R. 255. Other sources report more of the same. *See* UNHCR Ctr. for Documentation & Research, *Background Paper on Bulgarian Refugees and Asylum Seekers* (1994), *reprinted in* E.R. 190, 198 [hereinafter *UNHCR Background Paper*] ("While on a national level all citizens are granted constitutional protection against such arbitrary practices as illegal detention . . . and cruel or inhuman treatment, incidents on the local level are known to occur."); Human Rights Watch, *World Report 1999: Bulgaria: The Role of the International Community, reprinted in* E.R. 134, 134 (noting "ongoing abuses by the police and secret services").

The IJ also found that abuse of prisoners "is not keyed to any ethnic or racial group," E.R. 59, and this finding, too, is supported by substantial evidence. Both the State Department's 1998 report on human rights in Bulgaria and a 1997 State Department report describe prisoner abuse, but neither suggests it is limited to minorities. *See 1998 Human Rights Report* at E.R. 254; Bureau of Democracy, Human Rights & Labor, U.S. Dep't of State, *Bulgaria: Profile of Asylum Claims and Country Conditions* 2 (1997), *reprinted in* E.R. 112, 113 ("[T]here remain problems . . . in the treatment of

detainees and prisoners."). Although there are suggestions that gypsies are frequent targets of police beatings, *see, e.g.,* Richard Groves, *Changing the Face of Policing in Bulgaria, CPRSI Newsletter,* Apr. 1996, *reprinted in* E.R. 180, 181 (describing "allegations of police brutality" toward gypsies); *UNHCR Background Paper* at E.R. 198 (noting reports that "police frequently are either the perpetrators of violence against Roma or they fail to intervene when attacks are instigated"), petitioner has offered nothing to suggest— let alone compel—a finding that gypsies in Bulgarian prisons are treated worse than anyone else, nor that he himself was treated worse than other inmates. Without such a finding, there's no basis for jumping from the mere fact of abuse to the inference that it was on account of petitioner's ethnicity.

My colleagues misunderstand my argument when they respond that "[a]sylum seekers who have fled from generally repressive regimes have no higher a burden than those who have fled from generally benign countries." Maj. op. at 730. I'm not saying petitioner's treatment wasn't severe enough to be persecution; I assume it was. My point is that, since petitioner offered no evidence that he was singled out for mistreatment as a gypsy, he hasn't shown that the abuse was *on account of* his ethnicity. Thus, no matter how bad or how frequent, his beatings don't amount to persecution on one of the grounds specified in the asylum statute, if everyone else in his situation suffered exactly as he did.

\* \* \*

The record does not compel the conclusion that the officers who abused petitioner at the police station knew he's a gypsy. But even if it did, petitioner offered no evidence to show he was abused *because of* that ethnicity, and the IJ's well-supported

finding that all Bulgarian prisoners are at significant risk of being abused precludes any such inference. Because an arrest alone does not compel a finding of persecution, *see Prasad v. INS,* 47 F.3d 336, 339–40 (9th Cir.1995), I would deny the petition for review and express no view as to any of the other points it raises.