# MATTER OF TOBOSO-ALFONSO

## In Exclusion Proceedings

## A-23220644

### Decided by Board March 12, 1990[1]

An applicant, who had the status of being a homosexual, both established his membership in a particular social group in Cuba and demonstrated that his freedom was threatened within the meaning of section 243(h)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h)(1) (1990), on account of his membership in that group.

EXCLUDABLE: Act of 1952—Sec. 212(a)(9) [8 U.S.C. § 1182(a)(9)]—Crime involving moral turpitude

Sec. 212(a)(20) [8 U.S.C. § 1182(a)(20)]—No valid immigrant visa

Sec. 212(a)(23) [8 U.S.C. § 1182(a)(23)]—Convicted of controlled substance violation

ON BEHALF OF APPLICANT:
Harry A. Loftus, Esquire
602 Sawyer, Suite 201
Houston, Texas 77007

ON BEHALF OF SERVICE:
Patricia A. Cole
General Attorney

BY: Milhollan, Chairman; Dunne and Heilman, Board Members. Dissenting Opinion: Vacca, Board Member. Concurring in the Dissenting Opinion: Morris, Board Member.

In a decision dated February 3, 1986, the immigration judge found the applicant excludable under sections 212(a)(9), (20), and (23) of the Immigration and Nationality, 8 U.S.C. §§ 1182(a)(9), (20), and (23), denied his request for asylum, pursuant to section 208(a) of the Act, 8 U.S.C. § 1158(a), but granted his application for withholding of deportation to Cuba under section 243(h) of the Act, 8 U.S.C.

---

[1] As noted, this case was decided by the Board on March 12, 1990. By Attorney General Order No. 1895-94, dated June 19, 1994, the Attorney General ordered: "I hereby designate the decision of the Board of Immigration Appeals in *In re: Fidel Toboso-Alfonso* (A23 220 644) (March 12, 1990) as precedent in all proceedings involving the same issue or issues."

§ 1253(h). The Immigration and Naturalization Service has appealed this decision. The appeal will be dismissed.

The applicant is a 40-year-old native and citizen of Cuba who was paroled into the United States in June of 1980, as part of the Mariel boat lift. In 1985 his parole was terminated. He was placed in exclusion proceedings and appeared before an immigration judge in Houston, Texas. The applicant conceded his excludability and applied for asylum and withholding of deportation to Cuba.

The immigration judge ultimately concluded that the applicant was statutorily eligible for asylum and withholding of deportation as a member of a particular social group who fears persecution by the Cuban Government. He denied the applicant's request for asylum in the exercise of discretion, but granted him withholding of deportation.

The Service contends that the applicant did not meet his burden of proof, that the evidence presented was inadequate to prove the existence of a particular social group or a clear probability of persecution in Cuba, and that he was ineligible for withholding in view of his conviction for possession of cocaine. As the applicant did not appeal from the immigration judge's decision, the only issues now before us pertain to the immigration judge's grant of withholding of deportation to Cuba to this alien.

An alien who seeks withholding of deportation from any country must show that his "life or freedom would be threatened in such a country on account of race, religion, nationality, membership in a particular social group, or political opinion." Section 243(h)(1) of the Act. In order to make such a showing, the alien must establish a "clear probability" of persecution on account of one of the enumerated grounds. *INS v. Stevic,* 467 U.S. 407 (1984). This "clear probability" standard requires a showing that it is more likely than not that an alien would be subject to persecution. Unless an alien is barred from relief under the provisions of section 243(h)(2), once he establishes that he qualifies for withholding of deportation, it must be granted and he cannot be returned to the country where he would face persecution. He can, however, be sent to another country under certain circumstances.

In the instant case, the applicant asserts that he is a homosexual who has been persecuted in Cuba and would be persecuted again on account of that status should he return to his homeland. He submits that homosexuals form a particular social group in Cuba and suffer persecution by the government as a result of that status.

The applicant testified that there is a municipal office within the Cuban Government which registers and maintains files on all homosexuals. He stated that his file was opened in 1967, and every 2 or 3 months for 13 years he received a notice to appear for a hearing. The notice, the applicant explained, was a sheet of paper, "it says Fidel

820

Armando Toboso, homosexual and the date I have to appear." Each hearing consisted of a physical examination followed by questions concerning the applicant's sex life and sexual partners. While he indicated the "examination" was "primarily a health examination," he stated that on many occasions he would be detained in the police station for 3 or 4 days without being charged, and for no apparent reason. He testified that it was a criminal offense in Cuba simply to be a homosexual. The government's actions against him were not in response to specific conduct on his part (e.g., for engaging in homosexual acts); rather, they resulted simply from his status as a homosexual. He further testified that on one occasion when he had missed work, he was sent to a forced labor camp for 60 days as punishment because he was a homosexual (i.e., had he not been a homosexual he would not have been so punished).

The applicant stated that at the time of the Mariel boat lift, the Union of Communist Youth received permission to hold a demonstration against homosexuals at the factory where he worked. Several of the members got on top of a table and screamed that all homosexuals should leave—should go to the United States. He testified that on that same day there was a sheet of paper tacked to the door of his home which stated that he should report to "the public order." The applicant presented himself at the police station in the town of "Guines" where he was informed by the chief of police that he could spend 4 years in the penitentiary for being a homosexual, or leave Cuba for the United States. He was given a week to decide and decided to leave rather than be jailed.

The applicant further testified that the day he left his town, the neighbors threw eggs and tomatoes at him. He claims that the situation was so grave that the authorities were forced to reschedule his departure time from the afternoon to 2:00 a.m., in order to quell the protesting residents.

In addition to the applicant's testimony, he supplemented the record with the following information: several articles describing "Improper Conduct," a film which centers on the testimony of 28 Cuban refugees and recounts the human rights violations, including incarceration in forced labor camps known as "Military Units to Aid Production," suffered by Cubans whom the Government considers to be dissidents or "antisocial," particularly male homosexuals; a newspaper article entitled, "Gay Cubans Survive Torture and Imprisonment," in which Cuban homosexuals in the United States, most of whom were part of the Mariel boat lift, describe their treatment by the Cuban Government, including repeated detentions, incarcerations, and physical beatings; and, Amnesty International's Report for 1985 which describes the political situation in Cuba.

The immigration judge found the "applicant's testimony to be credible and worthy of belief, and, if anything, perceive[d] that he was restrained in his testimony as to the difficulty of his life during the years that he lived in Cuba." The immigration judge further concluded that the applicant had been persecuted in Cuba and that he has a well-founded fear of continued persecution in that country. He found that this persecution resulted from the applicant's membership in a particular social group, namely homosexuals. The immigration judge denied the applicant's asylum application in the exercise of discretion because of the nature of the applicant's criminal record in the United States. However, as the immigration judge found that the applicant's crimes did not bring him within the scope of section 243(h)(2)(B), he granted his application for withholding of deportation to Cuba.

The Immigration and Naturalization Service appeals from the grant of withholding of deportation to Cuba to the applicant, arguing that homosexuals were not a particular social group contemplated under the Act, that the applicant has not presented adequate evidence to show either a well-founded fear or a clear probability of persecution, and that the applicant is ineligible for relief under section 243(h) of the Act because of his conviction for possession of cocaine.

We do not find that the Service has presented persuasive arguments on which to reverse the immigration judge's finding that the applicant established his membership in a particular social group in Cuba. The Service argues that "socially deviated behavior, i.e. homosexual activity is not a basis for finding a social group within the contemplation of the Act" and that such a conclusion "would be tantamount to awarding discretionary relief to those involved in behavior that is not only socially deviant in nature, but in violation of the laws or regulations of the country as well." The applicant's testimony and evidence, however, do not reflect that it was specific activity that resulted in the governmental actions against him in Cuba, it was his having the status of being a homosexual. Further, the immigration judge's initial finding that a particular social group existed in Cuba was not "tantamount to awarding discretionary relief" to that group. Individuals in a particular social group are not eligible for relief based on that fact alone, among other showings they must establish facts demonstrating that members of the group are persecuted, have a well-founded fear of persecution, or that their life or freedom would be threatened because of that status.

We principally note regarding this issue, however, that the Service has not challenged the immigration judge's finding that homosexuality is an "immutable" characteristic. Nor is there any evidence or argument that, once registered by the Cuban government as a homosexual, that characterization is subject to change. This being the

case, we do not find the Service's challenge to the immigration judge's finding that this applicant was a member of a particular social group in Cuba adequately supported by the arguments set forth on appeal.

The next issue is whether the immigration judge erred in finding that the applicant had established that his life or freedom would be threatened in Cuba. The immigration judge not only found the applicant's testimony regarding the events in Cuba credible, but concluded that, if anything, he was "restrained in his testimony as to the difficulty of his life during the years that he lived in Cuba." In this regard, he noted that the applicant simply took as a matter of course that he "would be frequently detained for days [by government officials] while being subjected to verbal and physical abusive treatment." The applicant's testimony that simply because of his status as a homosexual he was advised by his government to leave the country or face incarceration for a period of 4 years is not contested. There is no evidence or allegation that this "choice" he was given resulted from any specific acts on his part or that the government did not intend to jail him if he failed to leave. The record indicates that rather than a penalty for misconduct, this action resulted from the government's desire that all homosexuals be forced to leave their homeland. This is not simply a case involving the enforcement of laws against particular homosexual acts, nor is this simply a case of assertion of "gay rights." Particularly in view of the final governmental threat that precipitated the applicant's departure from Cuba, we agree with the immigration judge's finding that the applicant's freedom was and is threatened within the contemplation of section 243(h)(1).

The final issue regarding his application for withholding of deportation to Cuba is whether he is ineligible for this relief under the provisions of section 243(h)(2)(B). Although we do not minimize the seriousness of the offenses for which this applicant was convicted, they are not "particularly serious crimes" as contemplated by section 243(h)(2)(B) of the Act, and the applicant is not barred from withholding of deportation. See Matter of Garcia-Garrocho, 19 I&N Dec. 423 (BIA 1986); Matter of Frentescu, 18 I&N Dec. 244 (BIA 1984). The applicant's drug conviction was for simple possession of cocaine and the Service agrees with the immigration judge's conclusion that the burglary offense was not a particularly serious crime within the scope of section 243(h)(2)(B).

In view of the mandatory nature of section 243(h), the immigration judge's grant of withholding of deportation to Cuba to the applicant will stand and the following order will be entered.

ORDER: The Service's appeal is dismissed.

*DISSENTING OPINION:* Fred W. Vacca, Board Member

I respectfully dissent.

As the majority correctly states, the sole matter before us on appeal is whether the applicant has demonstrated his eligibility for withholding of deportation to Cuba under the provisions of section 243(h) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h). To be eligible for withholding of deportation, the applicant must show that his "life or freedom would be threatened in such a country on account of race, religion, nationality, membership in a particular social group, or political opinion." Section 243(h)(1) of the Act. In order to make such a showing, he must establish a "clear probability" of persecution on account of one of these enumerated grounds. *INS v. Stevic,* 467 U.S. 407 (1984). This "clear probability" standard requires a showing that it is more likely than not that an alien would be subject to persecution.

On this record, I do not find that the applicant has shown a "clear probability" that his life or freedom would be threatened on account of one or more of the aforementioned grounds if he returns to Cuba. Accordingly, I would dismiss the appeal for this reason and order his exclusion and deportation to his country of nationality.

There are two principal factual aspects of the applicant's claim that he will likely be subject to persecution if returned to Cuba. The first relates to his treatment by the Cuban authorities from the time he was registered by the Government as a practicing homosexual in 1967 until 1980. The second relates specifically to the threat that was made to him in 1980—at the time of the "Marielito" exodus—to leave Cuba or be jailed for 4 years.

The applicant testified that he has been a practicing homosexual since he was 9 years old. The government apparently became aware of this fact in 1967 as he was put on a government register that year. He stated that he was never actually incarcerated because of his homosexuality. As a homosexual, however, he was called in and questioned by the authorities with some regularity. He testified that he was detained for several days "a whole bunch of times" as a result of "many investigations" because the authorities "said we knew everything ... homosexuals knew ... who was stealing and the assaults and everything." When asked whether the government examinations were primarily health examinations, the applicant responded: "Yes, and mostly ... so there wouldn't be any kind of disease or sickness." One specific incident the applicant referred to as occurring during this period was the subject of contradictory testimony. On one hand, he testified that he worked at a textile factory and that "no homosexuals could work there." Yet, when he violated a regulation about missing work for 3 days without a doctor's certificate, he stated that he was

sent to a work camp for 60 days because he was a homosexual. He testified that "if a woman missed out three days of work, and they didn't have anything like that against her, nothing would happen to her."[1] The applicant testified in a general manner that some homosexuals were imprisoned or sent to work camps in Cuba and that a friend "got five years for what is called being a dangerous person." He noted that homosexuality was a criminal offense in Cuba.

I do not find this testimony regarding the circumstances of the applicant's previous experiences in Cuba as a known practicing homosexual to be such as to indicate a "clear probability" that his life or freedom would be threatened if he were to return to that country. There are apparently Cuban criminal laws regarding homosexuality.[2] The applicant himself characterized his experiences with the authorities as part of either investigations or health examinations. He did not describe these incidents as his being "incarcerated" because he was a homosexual. The United States Supreme Court has in fact found that state criminal sodomy laws do not violate the fundamental rights of homosexuals. *Bowers v. Hardwick*, 478 U.S. 186 (1986). Considering the applicant's own characterization of the events, these experiences appear related to the investigation of criminal activities and the control of health matters rather than persecution of the applicant. The applicant presented some general background materials regarding the treatment of homosexuals (much of which relates to a documentary film describing "events of the middle and late sixties and early seventies"). The 1985 Amnesty International Report introduced by the applicant makes no reference to the treatment of homosexuals whatsoever. Particularly under such circumstances, I find the applicant's situation best evaluated in light of his own experiences over his 13 years as a known homosexual in Cuba.

The second aspect of the applicant's case, which I consider within the total factual context he has presented, is his testimony that in 1980 he was told by the authorities he would be jailed for 4 years if he did not leave the country. In my view, this threat must be evaluated in the context of the time and situation in which it was made. During the massive exodus of Cubans from Mariel in the spring of 1980, some departures were entirely voluntary, some coerced. Fidel Castro used

---

[1] He further testified in this regard that when he missed work "one would always try to justify with the doctor or something, but in that case, ... I wasn't able to justify." The date of this incident was never made entirely clear. In his testimony, he stated that it occurred "around 1975." However, this was apparently the incident he referred to on his asylum application as occurring in 1977 and involving 90 days imprisonment.

[2] No evidence was presented as to the specifics of Cuban criminal law in this regard.

the plight of the "Marielitos" as an opportunity to rid Cuba of many who were deemed undesirable by his government, including criminals and homosexuals. In view of his prior experiences, it is clear that the purpose of the particular threat to the applicant was to get him to leave the country. If he were to return to Cuba today with the permission of the Cuban authorities, has he demonstrated a "clear probability" that the threat made in 1980 has relevance? For reasons discussed in *Matter of Barrera*, 19 I&N Dec. 837 (BIA 1989), I would find that such is not the case. The Cuban government has agreed to the return of those who departed (many with "encouragement" or coercion) in 1980 and has given diplomatic assurances of "no reprisal" to those who are returned. As I view the threat to the applicant in 1980 as principally motivated to coerce his departure, I do not find that he has demonstrated a "clear probability" that has meaning today, particularly when viewed in the context of his experiences over the years from 1967 to 1980.

As I do not find that the applicant has adequately established that his "life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion," I would sustain the Service appeal in this regard and order the applicant excluded and deported from the United States.

*CONCURRING IN THE DISSENTING OPINION:* James P. Morris, Board Member

I concur in the foregoing dissenting opinion.