FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PETAR GEORGIEV DONCHEV;
AVGUSTINA TSVETANOVA ZHIVKOVA,
            *Petitioners,*

      v.

MICHAEL B. MUKASEY,* Attorney
General,

           *Respondent.*

No. 05-74709

Agency Nos.
A95-562-817
A95-562-816

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
September 24, 2007—Seattle, Washington

Filed January 16, 2009

Before: Betty B. Fletcher, Andrew J. Kleinfeld, and
Ronald M.Gould, Circuit Judges.

Opinion by Judge Kleinfeld;
Dissent by Judge B. Fletcher

---

    *Michael B. Mukasey is substituted for his predecessor, Alberto R. Gonzales, as Attorney General of the United States, pursuant to Federal Rule of Appellate Procedure 43(c)(2).

**COUNSEL**

Nicholas W. Marchi, Carney & Marchi, P.S., Seattle, Washington for the petitioners.

Andrew S. Biviano (argued) and Frank A. Wilson (briefed), Assistant U.S. Attorneys, Spokane, Washington for the respondent.

**OPINION**

KLEINFELD, Circuit Judge:

Petar Georgiev Donchev (Donchev ) seeks asylum, withholding of removal, and relief under the Convention Against Torture as a member of a particular social group, friends of the Roma.[1]

**FACTS**

Donchev entered the United States on March 1, 2003 at age 26 on a false Belgian passport that he bought. He is Bulgarian, not Belgian. His mother lives in Bulgaria, his sister in the United States, where she has become a citizen. Donchev was apprehended when special agents from the Bureau of Immigration and Customs Enforcement (ICE) executed a search warrant on his sister's residence, where Donchev lived. The search turned up numerous fraudulent immigration documents and about $40,000 cash.

---

[1] The IJ found that Donchev's wife, Avgustina Tsvetanova Zhivkova (Zhivkova) does not have an independent asylum claim. Zhivkova's application stands or falls with Donchev's.

The Department of Homeland Security initiated removal proceedings against Donchev. Donchev then applied for asylum, withholding of removal, and relief under the Convention Against Torture. His application says that his nationality is Bulgarian and that he seeks asylum or withholding of removal based on membership in a "particular social group." He claims:

> I have been held at police stations and have been mistreated and harmed because of my participation in the organizations for the rights of the gypsies. Some incidents consisted of being beaten and raped. I was harmed by people who are against gypsies and authority. All the mistreatments occurred several times in the past few years. I believe that happened because I am a part of a certain social group and participated there.

In the application he also says "I participated as a member of organizations that fights for rights of the gypsies." At the hearing Donchev testified that he has been a member of the "Roma organization" since 2000. He submitted a document that purports to be a membership card for the organization, Future for the Roma. Donchev testified at the hearing that he himself is not Roma. Nowhere in the application does Donchev claim to be Roma himself, just friends with Roma individuals and a friend of the Roma people.

Donchev repeats his claim of rape in his application when describing what he fears "will happen again" if he returns to Bulgaria. He never mentions the claim of rape in his testimony. Regarding his fears of future torture, he says "I am afraid and do fear if I return to my country those incidents will happen again. Torture that I fear is [b]eating, stalked, raped. I fear that if I return to my country I could be killed." Donchev also says in his application that his mother is dead. At the hearing he testified that his mother is alive, continues to live in Bulgaria, and obtained for him the forged immigra-

tion documents found during the search. Donchev also answered "No" on his application to the question of whether he had ever been "accused, charged, arrested, detained, interrogated, convicted and sentenced, or imprisoned in any country other than the United States." When later testifying, Donchev described two detentions by the police in conjunction with his work between 1998 and 2001. He also testified to an arrest and two other detentions in 2001, as well as to police abuse in 2002. He also claimed police abuse connected with these events. When asked to explain the discrepancy between the answer in his application and his testimony at the hearing, Donchev said that he had not understood the question. His application also indicates that his attorney prepared the application. At the hearing, Donchev testified that it was his sister who helped him, with his attorney only helping to mail it.

Donchev's testimony described a series of contacts with the fellow soldiers, police, and hoodlums before he left Bulgaria in February 2003. When Donchev served in the military in the early 1990s, he "was ordered to . . . mistreat [his Roma friends] and make them do things that were unpleasant by two senior lieutenants." Most of the time he refused to obey these orders, so he was arrested and put in military confinement. Donchev claimed that other soldiers in military confinement were ordered to beat him up and torture him. He testified that he was beaten up and got bruises, and that these beatings occurred frequently during his first six months in the military. He does not claim to have been tortured.

Donchev also testified to two contacts with the police in the late 1990s regarding a shop where he worked. Donchev was a salesperson at the shop, and the police questioned him about whether the shop was selling stolen merchandise. Donchev testified that the police confiscated "some clocks or watches," because they "had the notion that the merchandise was stolen because we were having trade relationships with gypsies . . . who were taking merchandise through the border from Turkey

through the city of Dimitrovgrad." Donchev was not beaten, but he was "threatened a lot; and I was psychologically harmed." The police threatened to confiscate the inventory that they believed was stolen.

On another occasion the shop windows were broken, and swastikas and other graffiti painted on the walls. The investigating officers suggested that the shop owner and Donchev had done it themselves to get insurance. Donchev went down to the police station, where they did not beat or otherwise harm him, nor did they charge him with any crime.

Donchev's first incident with the police involving violence, not just insulting remarks, came a few years later, in 2001. Donchev was riding in a car with Roma friends when the police stopped them for a "routine checkup." The police then took them to the police station, supposedly to check for alcohol consumption. They were not charged with any crime and were released after two hours. During the detention, one of Donchev's friends told the police that they had no right to detain them, after which the friend got his arm broken and Donchev was hit in the head. Donchev did not seek medical attention or claim that he needed it.

Donchev's next police contact was at a New Year's Eve party on December 31, 2001. He and his friends, most of whom were Roma, were drinking "very little, only some bubbly." He testified that the police "came [up to] my house and . . . they said there was a complaint that the celebration was too noisy. . . . They started using offending words towards us. And they said the 14th of January was the Roma New Year's Eve and that's when we were supposed to celebrate." After Donchev and his friends were taken to the local police department, Donchev testified that "[w]e were kicked. We were beaten with sticks — they used swear words against us." Asked whether he had any lasting injuries, he said, "No, I was psychologically hurt." They were released the "next day." Donchev was not charged with any offense.

Donchev's first claim of injury for which he sought medical attention arose when he and his friend were leaving church in June 2002. Two policemen started laughing and asked "what are the gypsies doing in a church." One of the policemen started hitting Donchev's friend with a baton. Donchev testified that when he tried to stop the policeman, the other policeman "hit me. The second one hit me in the back. I fell on the ground and I remember that I was kicked and I was hit with the baton." Donchev was not detained by the police or taken down to the police station. To prove his injuries he did submit a letter in Bulgarian from a doctor he saw two days later. The letter says that Donchev had cuts, a scrape, and bruises that caused significant pain and suffering, but were a temporary and non-life-threatening health disturbance.

Donchev also testified to two incidents with "skinheads." In January 2003 he was at a meeting of a pro-Roma organization, Future for the Roma. To prove his affiliation with Future for the Roma, Donchev submitted as an exhibit a membership card issued in 2000 by "Future for the [R]oma." When Donchev left the meeting, some skinheads beat him up. Nobody called the police "because everybody kn[ew] that the skinheads were the, the body that acts for — in the favor of the police." To prove his injuries, Donchev submitted a second doctor's letter. The letter stated that Donchev told the doctor that he had been assaulted, beaten, and robbed of his watch. The doctor observed swelling and bruising on his face and elsewhere, causing "temporary and non-life-threatening health disturbance. The injuries were accompanied by significant pain and suffering. They will heal in a relatively short time period without health consequences to the victim." Donchev and his friends also had incidents with the skinheads at soccer games.

Donchev did not testify that any particular incident, with the police or the skinheads, caused him to undertake his attempts to move to the United States. Donchev's mother remains in Bulgaria, as does his wife's sister. The Roma have

long been their "neighbors, our friends" and have "supported my mother and myself." There is no evidence that his mother had been arrested, harmed or even threatened, despite these friendships and sympathy for the Roma. Both his mother and sister-in-law continue to live among the Roma, and Donchev has never claimed that either fear for their lives or intend to leave Bulgaria.

According to the report in the record by the United States Department of State titled *Bulgaria: Profile of Asylum Claims and Country Conditions*, Bulgaria has a great deal of crime, corruption, and a bad economy. The report notes that "[a] third of the population consider themselves potential emigrants." The Roma "encounter prejudice and discrimination — and episodic violence — from both authorities and the general population, particularly in rural areas." Another report by the Center for Documentation and Information on Minorities in Europe — Southeast Europe, *Roma of Bulgaria*, describes the age-old abuse of the Roma in Bulgaria dating back to the days of the Ottoman Empire, where they were "at the bottom of society with little social mobility." This report also finds that Roma in Bulgaria "face discrimination in all spheres of social life." The "biggest factor" that determines the Roma's relationship with the Bulgarian government and general population, the Country Report says, is the high crime rate among the Roma population.

The record also includes a telegram from the United States Embassy in Sofia, Bulgaria. It was sent to the State Department on December 30, 2000, evidently for assisting with the evaluation of asylum claims. It notes that "[t]he political and human rights climate in Bulgaria has improved dramatically since the 1997 ascension of a democratic reform government. Human rights violations have been considerably reduced in both frequency and seriousness from the pre-1997 level, and certainly from the pre-1989 level. The individual instances of anti-Roma discrimination which still occur should not be equated with wholesale systematic persecution as contem-

plated by asylum law." It continues by explaining that "[t]he situation for the Roma in Bulgaria is a complex one. There are several distinct sub-populations of Bulgarian Roma. While many suffer economic privation, others are relatively wealthy and well-educated, and participate prominently in Bulgarian society. No objective basis exists for asylum to be awarded to Bulgarian Roma simply because of ethnicity. Although widespread discrimination of varying degrees still exists, there is no systematic or government-sponsored persecution of any ethnic group, Roma included. The GOB [Government of Bulgaria] has made great strides in recent years to reduce the climate of excessive force and human rights violations that once existed among the police forces under earlier Bulgarian regimes."

A follow-up report from the Department of Justice investigation of Donchev and his sister states that Yovka Miladinova (Miladinova), Donchev's sister, pled guilty and was sentenced to pay the maximum fine for violations under 8 U.S.C. § 1325(a)(3) and 8 U.S.C. § 2 of aiding and abetting unlawful entry by false document. This conviction arose out of the execution of the March 2003 search warrant on the home where Miladinova, Donchev and his wife were living. This search turned up Donchev's false passports and identification documents.

The Immigration Judge (IJ) found that Donchev and his wife were "generally truthful" in their testimony. The IJ nevertheless denied relief. This denial was based on several grounds. The IJ found the incidents described by Donchev to lack an "apparent connection" to a protected ground. Regarding Donchev's belief that he was ordered to mistreat Roma soldiers because his superiors knew him to be friends with the Roma, and then abused him because he refused to do so, the IJ found Donchev's claims about other's motives for the mistreatment he suffered to be merely speculative. The IJ concluded that Donchev "has made a leap in relating his friendship with particular soldiers to his refusal to follow

orders." The IJ found it just as likely that Donchev was punished because he disobeyed orders, as because of his friendships with the Roma.

The IJ also found that Donchev had numerous encounters with the police, during some of which they bruised and scraped him, but "[i]t appears he encountered the police either because they were investigating crimes (at his work) or maintaining peace (when he was partying with friends)." The IJ found "no indication" that the investigations into the stolen merchandise or damage to the store "were anything more than a normal police investigation." Regarding the detention to investigate suspected drunk driving, the IJ found it had nothing to do with a protected ground: "[t]here were six young people riding around in a car, possibly drinking, and challenging the authority of the police. This scenario repeats itself regularly with young men, even in this country — and there is no apparent connection to race, religion, nationality, political opinion or membership in a social group — just hot-headed young men and hot-headed cops." As for the skinheads who beat Donchev up and stole his watch when he was leaving the Future for the Roma meeting, the IJ was not satisfied that the assault and robbery had anything to do with Donchev's membership in a particular social group.

As stated above, despite the favorable credibility finding, the IJ nevertheless denied relief. The IJ concluded that Donchev failed to establish that he was persecuted or had a well-founded fear of future persecution based on his membership in a particular social group, friends and supporters of the Roma. The IJ rejected Donchev's claim of past persecution on account of the arrests, because "[e]ach time he was arrested he was questioned about specific criminal conduct." The IJ found that the evidence did not show that Donchev would be persecuted based upon a protected ground, or that it was "more likely than not" that Donchev would be subject to persecution if he returned to Bulgaria based upon a protected ground. As to his request for relief under the Convention

Against Torture, the IJ found that there was no "clear probability" that Donchev or his wife would be tortured, on account of the claimed protected ground, by anyone connected with the Bulgarian government or anyone who the government would or could not control.

The IJ thus denied Donchev's application for asylum, withholding of removal, and relief under the Convention Against Torture. The Board of Immigration Appeals (BIA) affirmed without opinion. We deny Donchev's and thus Zhivkova's petitions for review.

## STANDARD OF REVIEW

Where, as here, the BIA affirms the decision of the IJ without opinion, we review the IJ's decision as the final agency decision.[2] The IJ's factual determination that an alien has not established eligibility for asylum and withholding of removal is reviewed under the substantial evidence standard.[3] We must affirm the agency's factual findings if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole."[4] "The standard of review is extremely deferential: 'administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.' "[5]

Our review of agency determinations of asylum and withholding of removal is also constrained and highly deferential.[6]

---

[2]*Morales v. Gonzales*, 478 F.3d 972, 977 (9th Cir. 2007).

[3]*INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992).

[4]*Id.*

[5]*Farah v. Ashcroft*, 348 F.3d 1153, 1156 (9th Cir. 2003) (citing 8 U.S.C. § 1252(b)(4)); *see also Gu v. Gonzales*, 454 F.3d 1014, 1020-21 (9th Cir. 2006) (analyzing whether the evidence compels a contrary result).

[6]*Zehatye v. Gonzales*, 453 F.3d 1182, 1185 (9th Cir. 2006).

We are not free[7] to look anew at the testimony and then measure the soundness of the agency's decision by what we would have found.[8] Nor does evidence compel the opposite conclusion just because it would also support a different result.

To obtain reversal, Donchev bears the heavy burden to "show that the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution."[9] Even if the panel might reach a conclusion different from that reached by the IJ, we "may not reverse unless we determine that any reasonable factfinder would have been compelled to reach that conclusion."[10]

## ANALYSIS

To be eligible for asylum relief, Donchev is required to establish "refugee" status, i.e., that he is an alien unwilling or unable to return home "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."[11] A clear probability is required for withholding of removal.[12] For either type of relief, the persecution must be by government officials or by individuals that the government

---

[7]The dissent quotes extensively from the IJ's "summary of testimony," and draws its own conclusions, rather than focusing on whether there is substantial evidence to support the IJ's resolution of conflicting evidence in the "analysis of fact and law" section. This independent weighing of the testimony is what we are not permitted to do. *Gu*, 454 F.3d at 1018-19.

[8]*Id.* at 1018.

[9]*Elias-Zacarias*, 502 U.S. at 483-84; *Lolong v. Gonzales*, 484 F.3d 1173, 1178 (9th Cir. 2007) (en banc) (concluding that this court must uphold the IJ's determination unless "the evidence not only supports, but *compels* the conclusion that the asylum decision was incorrect." (alteration in original)

[10]*Lolong*, 484 F.3d at 1178.

[11]8 U.S.C. § 1101(a)(42)(A); *see also id.*

[12]8 U.S.C. § 1231(b)(3).

is unable or unwilling to control.[13] "Persecution is an extreme concept" that means something considerably more than discrimination or harassment.[14] Only subjectively genuine and objectively reasonable fears of persecution are eligible for relief.[15] The alien creates a rebuttable presumption of future persecution by showing that he has suffered past persecution, or by providing direct, specific evidence that credibly supports a reasonable fear.[16]

Donchev argues first that the IJ should have found past persecution, and second, that the persecution should have been found to be on account of "membership in a particular social group,"[17] friends of the Roma. He relies in part on our decision in *Mihalev v. Ashcroft*.[18]

I.  *Mihalev v. Ashcroft.*

[1] *Mihalev* is of no help to Donchev. Aside from their common nationality (Bulgarian), what is striking is how different these two petitioners are. Mihalev was Roma, Donchev is not. Mihalev was jailed, beaten, and otherwise abused for ten days after his first arrest (for a noisy party), two weeks after his second arrest (for walking around without his identification papers), and five days (until he escaped after being sexually assaulted by a prison guard) after the third arrest. Donchev was jailed for less than one day and detained only once for two hours. Our holding in *Mihalev* that there is "no question that Gypsies are an identifiable ethnic group and that being a Gypsy is a protected ground" (ethnicity) is of no help to Donchev, because he is not a Gypsy.

---

[13]*Santos-Lemus v. Mukasey*, 542 F.3d 738, 742 (9th Cir. 2008).

[14]*Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir. 1995); *see also Al-Saher v. INS*, 268 F.3d 1143, 1146 (9th Cir. 2001).

[15]*Lolong*, 484 F.3d at 1178.

[16]8 C.F.R. § 208.13 (2007); *Ghaly*, 58 F.3d at 1431.

[17]8 U.S.C. § 1101(a)(42)(A).

[18]388 F.3d 722 (9th Cir. 2004).

**[2]** Mihalev claimed that he suffered a well-founded fear of persecution based on three arrests by the Bulgarian police.[19] The first time, police jailed Mihalev on charges of instigating Roma gatherings after arresting him at a Roma birthday party where the police beat the other Roma guests, called them names, and said "Gypsies did not deserve to live." The second arrest occurred when the police demanded Mihalev's documents as he was walking on a street at night and Mihalev did not have them. Mihalev was arrested a third time at his "periodic check-in" at the police station. We held that substantial evidence *did* support the IJ's finding that the second and third arrests were not "on account of" a protected ground, and that being a Gypsy "played *no* role in the police mistreatment."[20] This holding is analogous to the IJ's finding in the case at bar — that being a friend of Gypsies played no role in Donchev's arrests. The IJ found that Donchev encountered police when they were investigating crimes or maintaining the peace. Substantial evidence supports the IJ's finding that any escalation during these encounters were caused by Donchev's friends challenging police authority.

**[3]** In *Mihalev* we also held that the record "compels the conclusion that the first arrest was 'on account of' [Mihalev's Roma] ethnicity."[21] Specifically, "[t]he police officers' contemporaneous declarations that Gypsies did not deserve to live and that Petitioner was being held because he had been organizing Gypsy gatherings"[22] compelled a conclusion that Mihalev's Gypsy ethnicity played some role. There were no analogous, contemporary declarations by the police or the skinheads in Donchev's case. The police never arrested or jailed Donchev on charges of organizing Gypsy gatherings, although Donchev organized and participated in his New

---

[19] *Id.* at 725-26.

[20] *Id.* at 727 (emphasis in original).

[21] *Id.*

[22] *Id.*

Year's Eve party, and participated in pro-Roma demonstrations (which did not result in arrest). Although the skinheads assaulted, beat, and robbed Donchev after he left a Friends of the Roma meeting, the IJ found that there was no evidence that it was "on account of" his friendships with the Roma or membership in Friends of the Roma. The skinheads who took Donchev's watch and money were not policemen. These facts support the IJ's finding that this was crime, not persecution. The location (outside the Roma organization's meeting) and timing alone do not compel the conclusion that Donchev was attacked *because of* a protected ground.[23]

## 2.   Particular Social Group.

In *Mihalev*, it was undisputed that the petitioner was part of an "identifiable ethnic group" that qualified as a protected ground.[24] The same is not true of Donchev.[25] Donchev does not claim that he was persecuted because of Roma ethnicity (his ethnicity is not Roma, but Bulgarian). Nor does he claim that he was persecuted on account of political opinion. Rather, Donchev claims that he was persecuted because he was in the

---

[23]In concluding that Donchev's arrests and mistreatment "were at least partially motivated by Donchev's affiliation with the Roma," the dissent fails to give proper deference to the IJ. *See* Dissent at 678. The question is not whether the evidence would *allow* us to reach a different conclusion, but whether the evidence compels us to. *Lolong*, 484 F.3d at 1178.

[24]*Mihalev*, 388 F.3d at 726.

[25]The IJ decided this case on the ground that Donchev had not proved persecution "on account of" his membership in a particular social group. The dissent focuses on whether Donchev was persecuted, a different question from *why* he was persecuted. Assuming without deciding that he was persecuted, that would still not entitle him to asylum under the statute unless his persecution was "on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The argument in the dissent that the evidence would support a conclusion that Donchev was persecuted because of his friendship with the Roma does not compel that conclusion, nor does it compel the conclusion that friends of the Roma are a "particular social group" within the meaning of the statute.

"particular social group" of friends of Roma individuals, or friends of the Roma people.

**[4]** To determine whether Donchev has a cognizable claim, we must determine what it means to be a "refugee." We begin by looking at the text of the statute. The statutory phrase is "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."[26] Although the other four protected grounds are denoted with a fair degree of clarity, except perhaps around the edges, "particular social group" needs interpretation to be understood. On its face, the term "particular social group" is ambiguous.[27]

We have previously defined "particular social group" to mean a group "united by 1) a voluntary association which imparts some common characteristic that is fundamental to the members' identities, or 2) an innate characteristic which is so fundamental to the identities or consciences of its members that they either cannot or should not be required to change it."[28] To determine whether a claimed group is a "particular social group," we consider "whether a group's shared characteristics gives members social visibility and whether the group can be defined with sufficient particularity to delimit its membership."[29] This attempt at a general definition is instructive, but very abstract. When we are talking about membership in something other than a tribe or clan, this definition is not very helpful to deciding cases because the abstractness allows most disputes to be decided either way.

---

[26] 8 U.S.C. § 1101(a)(42)(A).

[27] *See Elien v. Ashcroft*, 364 F.3d 392, 396 (1st Cir. 2004) (noting that the term "particular social group" is not free from ambiguity); *Lwin v. INS* 144 F.3d 505, 510 (7th Cir. 1998) (describing the meaning of "social group" as remaining "elusive").

[28] *Santos-Lemus v. Mukasey*, 542 F.3d 738, 744 (9th Cir. 2008) (quoting *Arteaga v. Mukasey*, 511 F.3d 940, 944 (9th Cir. 2007)).

[29] *Id.* (citing *Arteaga*, 511 F.3d at 944-45).

What is "fundamental" or "innate" to one person may be a passing fancy to another.

In interpreting the statute, we follow the procedure set forth in *Chevron*.[30] We first apply the normal rules of statutory construction. We are required, when faced with an ambiguous statutory term, to defer to the construction given it by the agency charged with the statute's administration, provided the interpretation is a permissible construction of the statute.[31] To determine whether an agency's construction is permissible, we look to the text and structure of the statute being construed.[32]

We look to the BIA's decisional law to assist us in this inquiry.[33] Under *INS v. Aguirre-Aguirre*,[34] we must give deference, as our sister circuits have,[35] to BIA law defining "particular social group."[36]

*In re Acosta*[37] was the BIA's first effort to develop the characteristics for what may constitute a "particular social group." The BIA focused on the characteristics of individuals claim-

---

[30]*Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984); *see also Chowdhury v. INS*, 249 F.3d 970, 972 (9th Cir. 2001).

[31]*See INS v. Aguirre-Aguirre*, 526 U.S. 415, 424-25 (1999).

[32]*INS v. Cardoza-Fonseca*, 480 U.S. 421, 448-49 (1987).

[33]*See, e.g.*, *In re S-E-G-*, 24 I. & N. Dec. 579 (B.I.A. 2008); *In re A-M-E & J-G-U-*, 24 I. & N. Dec. 69 (B.I.A. 2007); *In re C-A-*, 23 I. & N. Dec. 951 (B.I.A. 2006); *In re V-T-S-*, 21 I. & N. Dec. 792 (B.I.A. 1997); *In re Kasinga*, 21 I. & N. Dec. 357 (B.I.A. 1996) (en banc); *In re Toboso-Alfonso*, 20 I. & N. Dec. 819 (B.I.A. 1990); *In re Fuentes*, 19 I. & N. Dec. 658 (B.I.A. 1988); *In re Acosta*, 19 I. & N. Dec. 211 (B.I.A. 1985).

[34]526 U.S. at 424.

[35]*See, e.g.*, *Ucelo-Gomez v. Mukasey*, 509 F.3d 70 (2d Cir. 2007); *Castillo-Arias v. U.S. Att'y Gen.*, 446 F.3d 1190 (11th Cir. 2006); *Niang v. Gonzales*, 422 F.3d 1187 (10th Cir. 2005); *Elien*, 364 F.3d at 392; *Lukwago v. Ashcroft*, 329 F.3d 157 (3d Cir. 2003); *Lwin*, 144 F.3d 505.

[36]*Aguirre-Aguirre*, 526 U.S. at 424.

[37]19 I. & N. Dec. 211 (B.I.A. 1985).

ing membership in the group, while recognizing that whether a particular kind of group characteristic would qualify "remains to be determined on a case-by-case basis."[38] The BIA explained:

> The shared characteristic might be an innate one such as sex, color, or kinship ties, or in some circumstances it might be a shared past experience such as former military leadership or land ownership. The particular kind of group characteristic that will qualify under this construction remains to be determined on a case-by-case basis. However, whatever the common characteristic that defines the group, it must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences. Only when this is the case does the mere fact of group membership become something comparable to the other four grounds of persecution under the Act, namely, something that either is beyond the power of an individual to change or that is so fundamental to his identity or conscience that it ought not be required to be changed.[39]

The BIA has stated that the "essence" of the particularity requirement "is whether the proposed group can accurately be described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons. While the size of the proposed group may be an important factor in determining whether the group can be so recognized, the key question is whether the proposed description is sufficiently 'particular,' or is 'too amorphous . . . to create a benchmark for determining group membership.'"[40]

---

[38]*Id.* at 233.

[39]*Id.* at 233-34.

[40]*In re S-E-G-*, 24 I. & N. Dec. 579, 584 (B.I.A. 2008).

**[5]** The BIA has subsequently reaffirmed that "members of a 'particular social group' must share a common, immutable characteristic," one that the person "cannot change, or should not be required to change."[41] The immutable characteristic is a sine qua non for status as a member of a "particular social group," though it is not by itself sufficient.

As the BIA itself has recognized,[42] the immutability requirement may be inapplicable in some circumstances. Wealth, even a trivial amount of it, targeted many "kulaks" and "landlords" for persecution in the Soviet Union and Communist China. According to the State Department's Profile on Bulgaria and other evidence in the record, people in Bulgaria who have Roma friends are not targeted for persecution as the kulaks and landlords were.

The record does not suggest that Donchev, or friends of Roma individuals generally, are analogous to white freedom riders during the sixties, who were targeted because of their political activity on behalf of blacks. Donchev's police contacts did not arise out of any pro-Roma activities and several preceded his membership in Future for the Roma. Overexpansion of refugee status to include amorphous social groups is unfair to other immigrants, because asylum jumps people to the head of the line of those seeking permission to live in the United States.

**[6]** Just as we refuse to infer persecution on account of a political opinion "merely from acts of random violence by members of a village or political subdivision against their neighbors who may or may not have divergent . . . political views,"[43] we do not infer that people who are associated with a protected group automatically comprise a "particular social

---

[41]*In re A-M-E & J-G-U-*, 24 I. & N. Dec. 69, 73-74 (B.I.A. 2007) (citing *Acosta*, 19 I. & N. Dec. at 233).

[42]*Acosta*, 19 I. & N. Dec. at 233-34.

[43]*Ochave v. INS*, 254 F.3d 859, 865 (9th Cir. 2001).

group" for the purposes of asylum. The BIA applies "particular social group" to groups of people who are "unable by their own actions" to avoid persecution.[44]

[7] Some "particular social groups" recognized as such by the BIA include traditional clans or tribes. The BIA held in *In re V-T-S-* that persecution on account of a particular social group "refers to persecution that is directed toward an individual who is a member of a group that share common immutable characteristics . . . characteristics that members of the group either cannot change, or should not be required to change, because such characteristics are fundamental to their individual identities."[45] For example, the "characteristics of being a Filipino of mixed Filipino-Chinese ancestry cannot be changed and are therefore immutable."[46] The BIA relied upon the State Department's Country Profile, which reported that 1.5 percent of the Philippine population had "identifiable Chinese background" and reports that the Philippine government also recognized these individuals as a group. The Country Profile also stated that the police and government officials were colluding to make wealthy businessmen of Chinese ethnicity a target of extortion schemes and kidnappings-for-ransom.[47]

Similarly, in *In re Kasinga* the BIA held that young women of the Tchamba-Kunsuntu tribe of Northern Togo who do not undergo and oppose their tribe's practice of female genital mutilation were a particular social group.[48] The BIA explained that being a member of the Tchamba-Kunsuntu Tribe "cannot be changed," and the "characteristic of having intact genitalia

---

[44]*Acosta*, 19 I. & N. Dec. at 935.

[45]21 I. & N. Dec. 792, 798 (B.I.A. 1997).

[46]*Id.*

[47]*Id.* at 795.

[48]21 I. & N. Dec. 357, 365 (B.I.A. 1996).

is one that is so fundamental to the individual identity of a young woman that she should not be required to change it."[49]

The BIA held in *In re H-* that members of the Marehan subclan of Somalia was a particular social group, because it was "an entity which is identifiable by kinship ties and vocal inflection or accent."[50] The Marehan subclan was also economically identifiable as the ruling class in Somalia (the place of persecution), and as a minority "constitut[ing] less than 1 percent of the population of Somalia."[51] Relying on Country Reports for Somalia, the BIA held that in Somalia "clan membership is a highly recognizable, immutable characteristic that is acquired at birth and is inextricably linked to family ties" and that it was possible to discern "distinct and recognizable clans and subclans in Somalia."[52]

In *In re Toboso-Alfonso* the BIA held that persons identified as homosexuals by the Cuban government were a particular social group.[53] "[B]ecause of [Toboso-Alfonso's] status as a homosexual he was advised by his government to leave the country or face incarceration for a period of 4 years."[54] He was required to register with the Cuban government as a homosexual, and the Cuban government was known to detain, jail, and beat Cuban homosexuals.[55] Noting that the government's penalty for failure to leave Cuba was imprisonment, the BIA explained that Toboso-Alfonso's plight was "not simply a case involving the enforcement of laws against particu-

---

[49]*Id.* at 365-66.

[50]*In re H-*, 21 I. & N. Dec. 337, 340, 342-43 (B.I.A. 1996).

[51]*Id.* at 340.

[52]*Id.* at 342-43.

[53]20 I. & N. Dec. 819 (B.I.A. 1990).

[54]*Id.* at 823.

[55]*Id.* at 821.

lar homosexual acts, nor is this simply a case of assertion of 'gay rights.' "[56]

**[8]** Friends of Roma individuals or of the Roma people do not resemble those groups. Donchev was not born a friend of the Roma, like members of the Marehan subclan in *In re H-*, Filipinos of Chinese ancestry in *In re V-T-S-*, or the young women of the Tchamba-Kunsunti tribe in *In re Kasinga*. Nor is he a member of a highly recognizable economic or social minority. As a Bulgarian Christian, he is most identifiable with the ethnic, religious, and cultural *majority* in his country.

A comparison of the treatment of Donchev to the treatment of Roma during World War II, when Bulgaria was an ally of Germany, underscores the difference.[57] During the war, Bulgaria passed laws denying the Roma access to central parts of Sofia, forbidding their use of public transportation, and giving them smaller food rations than other Bulgarians. In some places, the government forced the Roma to convert to Christianity and outlawed marriages between Bulgarians and Roma. Donchev has not claimed *any* restrictions on his freedom to work, to marry, or to eat. The experience of other members of Donchev's own family shows that friends of Roma are not viewed or treated in a uniform way by the Bulgarian government or Bulgarian society. The Roma were not only neighbors of Donchev, but also of his mother. Donchev testified that the Roma were his mother's friends after Donchev's father passed away, and that the Roma supported their family. Yet Donchev's mother remains in Bulgaria, and Donchev never claimed or testified that she was arrested or even harassed, although she also has visible friendships with the Roma.[58]

---

[56]*Id.*

[57]*See* Ctr. for Documentation & Info. on Minorities in Europe — Southeast Europe, *Roma of Bulgaria* 5.

[58]*Cf. Aruta v. INS*, 80 F.3d 1389, 1395 (9th Cir. 1996) (approving the use of "family evidence and the inferences drawn from it" to support the agency's decision); *Chavez v. INS*, 723 F.2d 1431, 1434 (9th Cir. 1984) (noting that the family had remained in the country and not been harassed).

The BIA has stressed the importance of social visibility as a factor in defining a particular social group. It has found that no "particular social group" exists for individuals merely claiming to be "affluent Guatemalans,"[59] former noncriminal informants working against a drug cartel,[60] and Salvadoran youths who had rejected gang recruitment efforts.[61]

We said in *Ochoa v. Gonzales*, consistent with the BIA's construction, that the "[k]ey to establishing a 'particular social group' is ensuring that the group is narrowly defined."[62] We held in *Ochoa* that "business persons" who rejected the demands of narco-traffickers were "too broad to qualify as a particularized social group."[63] There is no principled distinction that allows rejection of refugee status for persecuted business persons who resisted narco-traffickers but grants it to persecuted friends of Roma individuals or the Roma people.[64]

In *Sanchez-Trujillo v. INS*, we held that young urban males who had not served in the military were not the "type of cohesive, homogeneous group" embraced by the statutory term "particular social group."[65] We held in *Santos-Lemos v. Mukasey*,[66] which applied *Ochoa* and *Sanchez-Trujillo*, that the group of young Salvadorans who had refused to accede to gang recruitment was "too broad and diverse" and lacked the

---

[59] *In re A-M-E & J-G-U-*, 24 I. & N. Dec. 69, 75-76 (B.I.A. 2007).

[60] *In re C-A-*, 23 I. & N. Dec. 951, 957-58 (B.I.A. 2006).

[61] *In re S-E-G-*, 24 I. & N. Dec. 579 (B.I.A. 2008).

[62] *Ochoa v. Gonzales*, 406 F.3d 1166, 1170 (9th Cir. 2005).

[63] *Id.* at 1171.

[64] Nor has the dissent suggested that they are distinguishable. Instead, the dissent simply assumes that any "supporters" of an ethnic, political, or religious group are themselves a "particular social group." This assumption is unwarranted under *Santos-Lemos* and *Ochoa*. Supporters must make the same showing as other individuals claiming to be part of a "particular social group."

[65] 801 F.2d 1571, 1577 (9th Cir. 1986).

[66] 542 F.3d 738 (9th Cir. 2008).

requisite "social visibility" to qualify as a "particular social group."[67]

It is impossible to define "particular social group" with precision for all contexts, and dangerous to those who may be persecuted for group membership that we cannot anticipate, because the potential range of persecution of some people by others cannot be fully embraced by the imagination. Various factors, such as immutability, cohesiveness, homogeneity, and visibility, are helpful in various contexts, but they are not exhaustive. The traditional common law approach, looking at hypothetical cases and commonalities in cases that go one way or the other, is more prudent. When the Hutus in Rwanda murdered as many Tutsis as they could, the persecution was not on account of "race, religion, nationality, . . . , or political opinion."[68] But ethnicity, being Tutsi, fits well into the "particular social group" category. Likewise, the persecution of the Roma in Bulgaria during World War II was of a "particular social group."

[9] Persons who have declined to join gangs, who have not served in the military, and who have declined to pay money to drug dealers differ in obvious ways from the Tutsis in Rwanda, most obviously in that they have chosen a course of conduct that led others to harm them, whereas the Tutsis did not. Donchev's claim arises out of the choices he made in his friends. We cannot say that "any reasonable adjudicator would be compelled to conclude"[69] that Donchev's friendship with Roma individuals and the Roma people made him part of a "particular social group."

[10] Because a reasonable adjudicator would not be compelled to conclude that friends of Roma individuals or of the

---

[67]*Id.* at 745-46.

[68]*See* 8 U.S.C. § 1101(a)(42)(A).

[69]8 U.S.C. § 1252(b)(4)(B) (2006); *see Zehatye v. Gonzales*, 453 F.3d 1182, 1185 (9th Cir. 2006).

Roma generally are a "particular social group," the remaining issues raised in this case do not require adjudication. Accordingly, we need not decide whether what happened to Donchev was "past persecution," or whether his friendship with the Roma caused the mistreatment he suffered. We thus do not reach the question of whether the government overcame the presumption of a well-founded fear that would arise from past persecution.

**PETITION DENIED.**

---

B. FLETCHER, Circuit Judge, dissenting:

I respectfully dissent from the denial of Donchev's claim of asylum. His credible testimony and corroborating evidence compel a finding of past persecution in Bulgaria. This shifts the burden to the government to rebut the presumption of a well-founded fear of future persecution by a preponderance of the evidence. I would therefore remand this case to the agency for an individualized analysis of how current country conditions affect the reasonableness of Donchev's fear of persecution if he is returned to Bulgaria.

### I.   Past Persecution

The Immigration Judge found that Donchev credibly testified that he experienced severe mistreatment in Bulgaria. The IJ also repeatedly credited Donchev's testimony that he was targeted because of his association with the Roma, stating, for example, "It was obvious that there was no reason for [the police] to fine [Donchev and his Roma friends] or detain them, but the police kept searching for reasons." It can therefore not be said that substantial evidence in the record supports the IJ's conclusion that Donchev was not persecuted "on account of" his support for the Roma. *See Mihalev v. Ashcroft*, 388 F.3d 722, 727 (9th Cir. 2004).

## A. Persecution

The abuse that Donchev suffered over the course of a decade clearly rose to the level of persecution. *See Baballah v. Ashcroft*, 367 F.3d 1067, 1076 (9th Cir. 2004) ("[T]he severity of harm is compounded when incidents of persecution have occurred on more than one occasion, particularly where an applicant is victimized at different times over a period of years."). We have "consistently found persecution where . . . the petitioner was physically harmed because of" a protected ground. *Mihalev*, 388 F.3d at 729 (quoting *Duarte de Guinac v. INS*, 179 F.3d 1156, 1161 (9th Cir. 1999)). Although a "single four-to-six-hour detention, in which Petitioner was hit on his stomach and kicked from behind," may be insufficient to compel a finding of past persecution, *see Prasad v. INS*, 47 F.3d 336, 339 (9th Cir. 1995), such a finding is compelled in this case because of the repeated and severe nature of the abuse, *see Mihalev*, 388 F.3d at 729 ("The operative question is whether, looking at the cumulative effect of all the incidents that a Petitioner has suffered, the treatment he received rises to the level of persecution.") (quoting *Gormley v. Ashcroft*, 364 F.3d 1172, 1176 (9th Cir. 2004)).

During his time in the military, Donchev was beaten almost every day, sometimes twice a day, because he refused to mistreat Roma soldiers. Such physical abuse cannot be considered legitimate punishment for failing to follow orders, particularly where, as here, those orders were given in order to effectuate the officers' discrimination against an ethnic minority. *Cf. Tagaga v. INS*, 228 F.3d 1030, 1034 (9th Cir. 2000) (finding past persecution when asylum seeker had been court martialed for refusing to follow orders to arrest and detain Indo-Fijians); *Barraza Rivera v. INS,* 913 F.2d 1443, 1451 (9th Cir. 1990) (holding that punishment for "refusing to comply with orders . . . because they violate standards of human decency" can itself amount to persecution).

Donchev also testified to four run-ins with the police after he left the military. In all of these cases, Donchev was detained; in most, he was beaten. He was never, however, charged with any crime. We have repeatedly held that detention and mistreatment partially motivated by a protected ground and not accompanied by formal prosecution is persecution that provides a proper basis for asylum even if there also is a legitimate reason for the detention. *See, e.g.*, *Mihalev*, 388 F.3d at 727; *Ndom v. Ashcroft*, 384 F.3d 743, 755 (9th Cir. 2004), *superseded by statute as stated in Parussimova v. Mukasey*, 533 F.3d 1128, 1133 (9th Cir. 2008); *Ratnam v. INS*, 154 F.3d 990, 996 (9th Cir. 1998); *Singh v. Ilchert*, 63 F.3d 1501, 1509 (9th Cir. 1990), *superseded by statute as stated in Parussimova*, 533 F.3d at 1133; *Ramirez Rivas v. INS*, 899 F.2d 864, 867-68 (9th Cir. 1990); *Blanco-Lopez v. INS*, 858 F.2d 531, 534 (9th Cir. 1988), *superseded by statute as stated in Parussimova*, 533 F.3d at 1133.[1]

In addition to this conduct by the Bulgarian police and military, Donchev also testified that he was persecuted by skinheads. The skinheads threatened him at work and he often had to clean swastikas off the wall. They would also come after unsuccessful attempts by the police to stop a pro-Roma demonstration and beat up the participants. In the most serious incident, shortly before he left Bulgaria, Donchev was beaten up and strangled by people dressed like skinheads when he was leaving the annual meeting of the Future for the Roma organization. Although Donchev did not testify that they said anything about him being a Roma or Roma supporter during that attack, the timing and location of the action is strong circumstantial evidence that they targeted him because of his

---

[1]Because Donchev filed his application for asylum in 2003, the provisions of the REAL ID Act of 2005 do not apply to his case. Therefore, Donchev is not required to prove that the protected ground was "one central reason" for his persecution. *Cf. Parussimova*, 533 F.3d at 1135-36 (holding that although the petitioner's assailants made ethnic slurs when they attacked her, the evidence did not compel a conclusion that her ethnicity was a "central motivating reason" for the attack).

membership in the organization. According to Donchev's credible testimony, the police were not contacted after this attack because everybody knew that the police and the skinheads frequently worked together. In the face of this type of governmental acquiescence, harassment and violence by private actors constitutes persecution, even if the victim does not report it to the police. *Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1057-58 (9th Cir. 2006) (holding that victim of private persecution need not report that persecution to the authorities if doing so would be futile, as when the authorities themselves are responsible for similar persecution).

Particularly relevant in evaluating Donchev's claim is *Mihalev v. Ashcroft*, 388 F.3d 722. Although the majority is correct that the petitioner in *Mihalev* was of Roma ethnicity and Donchev is not, the petitioners' ethnicity is a distinction without a difference because *Mihalev* informs our analysis of whether Donchev was persecuted, not the reason for that persecution. Ethnicity aside, the facts of these two cases are strikingly similar. In both cases, the police broke up an exclusively- or primarily-Roma party, allegedly in response to a noise complaint, and proceeded to make offensive comments about Roma and beat the attendees, and detained the petitioners without charge. Significantly, this Court remanded Mihalev's case based on that single arrest, whereas Donchev was persecuted on multiple occasions. In that sense, Donchev's case is actually stronger than that of Mihalev, despite the fact that Donchev is not a Roma.

## B. "On Account of"

An asylum applicant must demonstrate that the persecution he suffered is "on account of" a protected ground: race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1158(b)(1)(B)(I). The record compels the conclusion that Donchev was persecuted on account of his membership in a particular social group.

### 1.   Particular Social Group

On his asylum application, Donchev indicated that he was persecuted on account of his membership in a particular social group—supporters of the Roma. We have defined "particular social group" to mean a group "united by 1) a voluntary association which imparts some common characteristic that is fundamental to the members' identities, or 2) an innate characteristic which is so fundamental to the identities or consciences of its members that they either cannot or should not be required to change it." *Santos-Lemus v. Mukasey*, 542 F.3d 738, 744 (9th Cir. 2008) (quoting *Arteaga v. Mukasey*, 511 F.3d 940, 944 (9th Cir. 2007)). *See also In re A-M-E- & J-G-U-*, 24 I. & N. Dec. 69, 73 (BIA 2007) (citing *Matter of Acosta*, 19 I. & N. Dec. 211, 233-34 (BIA 1985)). Here, Donchev's "characteristic" is his friendships with, support, and defense of the Roma. This characteristic is fundamental to his individual identity and conscience and he should not be required to change it.

While in the military, Donchev was beaten because he refused to carry out discriminating orders. As a civilian, he was repeatedly detained and beaten by the police but never prosecuted. These detentions were at least partially motivated by Donchev's affiliation with the Roma, and were therefore on account of his support for the Roma. *See, e.g.*, *Mihalev*, 388 F.3d at 727. With respect to one incident, the IJ concluded that there was no legitimate reason for the detention; in another case, the police explicitly suggested that Donchev was responsible for a theft because "he has friends who are gypsies"; in a third case, the police specifically said "what are the gypsies doing in a church," before they began to beat Donchev and his friend, using not only their hands and feet, but also batons. *Cf. Kebede v. Ashcroft*, 366 F.3d 808, 812 (9th Cir. 2004) (holding that statements by attackers compelled a finding that the nexus requirement was met); *Maini v. INS*, 212 F.3d 1167, 1175-76 (9th Cir. 2000) (same). Finally, he formally associated himself with a pro-Roma orga-

nization, participated in their demonstrations and meetings, and as a result, suffered a brutal attack by skinheads. This evidence compels a conclusion that Donchev's persecution was on account of his membership in the particular social group of supporters of the Roma people.

### 2. Relevance of Embassy Telegram

As thoroughly demonstrated above, the record is replete with evidence that Donchev, himself, was persecuted on account of his membership in the particular social group of Roma supporters. He was targeted because of his association with, and support for, the Roma, an ethnic minority. This was a voluntary association characterized by his membership in the pro-Roma organization, Future for Roma, and his refusal to mistreat Roma when ordered to do so by his superiors in the military. This individualized evidence is not discredited by a telegram from the U.S. Embassy stating that although the human rights situation has improved, "individual instances of anti-Roma discrimination which still occur should not be equated with wholesale systematic persecution." *See Chebchoub v. INS*, 257 F.3d 1038, 1044 (9th Cir. 2001) (stating that the BIA could rely on a country report to refute the applicant's generalized statements about country conditions, but "not to discredit specific testimony regarding his individual experience"); *Duarte de Guinac*, 179 F.3d at 1162 (stating that the purpose of country condition evidence is to enable the factfinder to "intelligently evaluate the petitioner's credibility"). This telegram was not sent in response to Donchev's petition. It is dated December 30, 2000, almost three years before he applied for asylum, and contains only general statements about the Roma in Bulgaria. Importantly, Donchev's testimony is not inconsistent with the telegram, which simply states that some Bulgarian asylum seekers were awarded asylum based on the general perception that Roma are persecuted despite the fact that those applicants failed to present any evidence that they themselves had been persecuted. In contrast, Donchev's credible testimony establishes that he suffered per-

secution because of his association with the Roma. *See Duarte de Guinac*, 179 F.3d at 1162-63 (reversing BIA conclusion that State Department reports regarding discrimination against indigenous people in Guatemala failed to provide adequate support for Duarte de Guinac's persecution claim because the report did not contradict his testimony regarding what happened to him). Therefore, I cannot agree with the majority that this single document establishes that Donchev was not persecuted because of his association with the Roma in light of the compelling direct evidence that he was targeted because of that association.

## II.   Fear of Future Persecution

The Immigration Judge denied Donchev's asylum claim because he failed to establish a well-founded fear of future persecution. However, because the record compels the conclusion that Donchev suffered persecution in the past, the burden was on the government to rebut the presumption of future persecution. 8 C.F.R. § 1208.13(b)(1). In order to do this, the government must establish by a preponderance of the evidence that there has been a fundamental change in circumstances in the country of origin such that the asylum seeker no longer has a well-founded fear of persecution. 8 C.F.R. § 1208.13(b)(1)(i). The government's evidence must allow the BIA to make "an individualized analysis of how changed conditions will affect [Donchev's] situation." *Lopez v. Ashcroft*, 366 F.3d 799, 805 (9th Cir. 2004) (citation omitted). Generalized country information from the State Department is not by itself sufficient to rebut the presumption. *Molina-Estrada v. INS*, 293 F.3d 1089, 1096 (9th Cir. 2002). Because the Immigration Judge failed to properly shift the burden to the government and failed to consider the issue of changed country conditions, I would remand. *See INS v. Ventura*, 537 U.S. 12, 16 (2002) (per curiam) (holding that Courts of Appeals cannot decide the issue of changed country conditions in the first instance). I note that no Country Report on

Human Rights Practices for Bulgaria is contained in the Administrative Record.

### III.   Withholding of Removal

Once a petitioner establishes past persecution, he is entitled to a presumption of withholding of removal. *Mihalev*, 388 F.3d at 731. Because I believe that the record compels the conclusion that Donchev was persecuted in the past,[2] I would remand the case so that the BIA consider his withholding of removal claim or, if appropriate, remand to the IJ to do so.

---

[2]My dissent, contrary to Judge Kleinfeld's unfair assertion, does not independently weigh the evidence. Rather, it rigorously applies the substantial evidence standard and concludes that the record compels reversal and remand. *See* Dissent at 674 (last line), Dissent at 679 (last line of Part I.B.1).